No. 14-3653

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellant,*

v.

CVS PHARMACY, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, No. 1:14-cv-00863
Honorable John W. Darrah, District Judge, Presiding

# RESPONSE BRIEF OF DEFENDANT-APPELLEE CVS PHARMACY, INC.

Eric S. Dreiband*
(esdreiband@jonesday.com)
Yaakov M. Roth
(yroth@jonesday.com)
Nikki L. McArthur
(nmcarthur@jonesday.com)
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

* Counsel of Record

*Counsel for Defendant-Appellee*
*CVS Pharmacy, Inc.*

# CIRCUIT RULE 26.1 DISCLOSURE STATEMENT

The undersigned counsel for Defendant-Appellee CVS Pharmacy, Inc. furnishes the following statement in compliance with Circuit Rule 26.1:

(1) The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

**CVS Pharmacy, Incorporated.**

(2) The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the District Court or before an administrative agency) or are expected to appear for the party in this court:

**Jones Day**

(3) If the party or amicus is a corporation:

i) Identify all its parent corporations, if any:

**CVS Health Corporation.**

ii) List any publicly held company that owns 10% or more of the party's or amicus' stock:

**N/A.**

**JONES DAY**

/s/ Eric S. Dreiband
Attorney for Defendant-Appellee
CVS Pharmacy, Inc.

51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939
(202) 626-1700 (facsimile)

# TABLE OF CONTENTS


Page

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... iv

JURISDICTIONAL STATEMENT ..... 1

STATEMENT OF THE ISSUES ..... 1

STATEMENT OF THE CASE ..... 1

1. CVS Offered Severance Agreements That Expressly Preserved Former Employees' Rights To Participate in EEOC Proceedings ..... 2

2. When a Former CVS Employee Filed a Discrimination Charge with EEOC, the Agency Dismissed the Charge, but an EEOC Attorney Found "Reasonable Cause" Arising from CVS's Severance Agreement ..... 5

3. Despite CVS's Entreaties and Willingness To Clarify the Severance Agreement's Language, EEOC Refused to Conciliate Its "Pattern or Practice" Claim Before Filing Suit ..... 6

4. The District Court Granted CVS's Dispositive Motion ..... 7

SUMMARY OF ARGUMENT ..... 9

ARGUMENT ..... 13

I. CVS'S SEVERANCE AGREEMENT IS NOT A "PATTERN OR PRACTICE" OF INTENTIONAL "RESISTANCE" TO TITLE VII RIGHTS ..... 13

A. EEOC's Premise Is False, Because the Agreement Permits Former Employees To Participate and Cooperate in EEOC Proceedings ..... 13

B. EEOC Cannot State a "Pattern or Practice" Claim Without Alleging That CVS Ever Committed *Any* Unlawful Employment Practices ..... 23

C. EEOC Cannot Plausibly Allege That CVS *Intentionally* Sought To Deny Title VII Rights by Offering a Severance Agreement That Former Employees Might *Misunderstand* ..... 37

II. THE EEOC VIOLATED BOTH TITLE VII AND ITS OWN REGULATIONS WHEN IT SKIPPED MANDATORY PRE-SUIT PROCEDURES AND FILED THIS SUIT ..... 39

A. EEOC Must Attempt To Resolve *All* Claims Through Confidential Conciliation Before Bringing Suit, But It Violated That Duty Here ..... 39

B. EEOC's Revisionist Account Misreads the Statute, Distorts the Regulations, and Conflicts with Longstanding Caselaw ..... 45

CONCLUSION ..... 51

CERTIFICATE OF COMPLIANCE .....

CERTIFICATE OF SERVICE .....

# TABLE OF AUTHORITIES

Page(s)

CASES

*14 Penn Plaza LLC v. Pyett*,
556 U.S. 247 (2009) .................................................... 36

*Aeroground, Inc. v. CenterPoint Props. Trust*,
738 F.3d 810 (7th Cir. 2013) .................................................... 18

*Alexander v. Gardner-Denver Co.*,
415 U.S. 36 (1974) .................................................... 40

*Arbaugh v. Y & H Corp.*,
546 U.S. 500 (2006) .................................................... 27

*Arendt v. Vetta Sports, Inc.*,
99 F.3d 231 (7th Cir. 1996) .................................................... 49

*Atkins v. City of Chicago*,
631 F.3d 823 (7th Cir. 2011) .................................................... 38

*Babrocky v. Jewel Food Co.*,
773 F.2d 857 (7th Cir. 1985) .................................................... 28

*Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*,
73 F.3d 150 (7th Cir. 1996) .................................................... 23

*Beckel v. Wal-Mart Assocs., Inc.*,
301 F.3d 621 (7th Cir. 2002) .................................................... 32, 35

*Blue v. Hartford Life & Acc. Ins. Co.*,
698 F.3d 587 (7th Cir. 2012) .................................................... 49

*Brandeis Mach. & Supply Co. v. NLRB*,
412 F.3d 822 (7th Cir. 2005) .................................................... 38

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .................................................... 21, 22

*Burlington Indus. v. Ellerth*,
524 U.S. 742 (1998) .................................................... 39

*Carson v. Am. Brands, Inc.*,
450 U.S. 79 (1981) .................................................... 14

*Celestine v. Petroleos de Venezuella SA*,
266 F.3d 343 (5th Cir. 2001) ........ 29

*Coleman v. Donahoe*,
667 F.3d 835 (7th Cir. 2012) ........ 24

*Council 31, AFSCME, AFL-CIO v. Ward*,
978 F.2d 373 (7th Cir. 1992) ........ 28, 37

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*,
555 U.S. 271 (2009) ........ 16

*DeCecco v. UPMC*,
3 F. Supp. 3d 337 (W.D. Pa. 2014) ........ 25

*EEOC v. Allstate Ins. Co.*,
778 F.3d 444 (3d Cir. 2015) ........ 14

*EEOC v. Asplundh Tree Expert Co.*,
340 F.3d 1256 (11th Cir. 2003) ........ 40

*EEOC v. Astra USA, Inc.*,
94 F.3d 738 (1st Cir. 1996) ........ 20, 21, 35, 38

*EEOC v. Bass Pro Outdoor World, LLC*,
35 F. Supp. 3d 836 (S.D. Tex. 2014) ........ 29

*EEOC v. Bass Pro Outdoor World, LLC*,
1 F. Supp. 3d 647 (S.D. Tex. 2014) ........ 42

*EEOC v. Bloomberg L.P.*,
751 F. Supp. 2d 628 (S.D.N.Y. 2010) ........ 42

*EEOC v. Chicago Club*,
86 F.3d 1423 (7th Cir. 1996) ........ 38

*EEOC v. Cognis Corp.*,
No. 10-cv-2182, 2012 U.S. Dist. LEXIS 71870
(C.D. Ill. May 23, 2012) ........ 25

*EEOC v. CollegeAmerica Denver, Inc.*,
No. 14-cv-1232, 2014 U.S. Dist. LEXIS 167055
(D. Colo. Dec. 2, 2014) ........ 22

*EEOC v. Cont'l Oil Co.*,
548 F.2d 884 (10th Cir. 1977) ........ 48

*EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*,
821 F.2d 1085 (5th Cir. 1987) .......... 14, 34

*EEOC v. CRST Van Expedited, Inc.*,
679 F.3d 657 (8th Cir. 2012) .......... 43

*EEOC v. Frank's Nursery & Crafts, Inc.*,
177 F.3d 448 (6th Cir. 1999) .......... 34

*EEOC v. Harvey L. Walner & Assocs.*,
91 F.3d 963 (7th Cir. 1996) .......... 48

*EEOC v. JBS USA, LLC*,
940 F. Supp. 2d 949 (D. Neb. 2013) .......... 42

*EEOC v. Kaplan Higher Educ. Corp.*,
790 F. Supp. 2d 619 (N.D. Ohio 2011) .......... 42

*EEOC v. Mach Mining, LLC*,
738 F.3d 171 (7th Cir. 2013),
*rev'd on other grounds*, 135 S. Ct. 1645 (2015) .......... 38

*EEOC v. Morgan Stanley & Co.*,
No. 01-Civ-8421, 2002 U.S. Dist. LEXIS 17484
(S.D.N.Y. Sept. 20, 2002) .......... 25

*EEOC v. Nucletron Corp.*,
563 F. Supp. 2d 592 (D. Md. 2008) .......... 25

*EEOC v. Sears, Roebuck & Co.*,
839 F.2d 302 (7th Cir. 1988) .......... 28

*EEOC v. Sears, Roebuck & Co.*,
857 F. Supp. 1233 (N.D. Ill. 1994) .......... 25

*EEOC v. Severn Trent Servs., Inc.*,
358 F.3d 438 (7th Cir. 2004) .......... 17, 19, 22, 35

*EEOC v. Shell Oil Co.*,
466 U.S. 54 (1984) .......... *passim*

*EEOC v. SunDance Rehabilitation Corp.*,
466 F.3d 490 (6th Cir. 2006) .......... 19, 25, 38

*EEOC v. United Air Lines*,
No. 73-C-972, 1975 U.S. Dist. LEXIS 11689
(N.D. Ill. June 26, 1975) .......... 42

*EEOC v. Waffle House, Inc.*,
534 U.S. 279 (2002) ... 27

*EEOC v. Whirlpool Corp.*,
80 F.R.D. 10 (N.D. Ind. 1978) ... 42

*EEOC v. Zia Co.*,
582 F.2d 527 (10th Cir. 1978) ... 40

*Gen. Tel. Co. of Nw. v. EEOC*,
446 U.S. 318 (1980) ... *passim*

*Horn Farms, Inc. v. Johanns*,
397 F.3d 472 (7th Cir. 2005) ... 47

*Int'l B'hd of Teamsters v. United States*,
431 U.S. 324 (1977) ... 27, 29, 30

*Isbell v. Allstate Ins. Co.*,
418 F.3d 788 (7th Cir. 2005) ... 15, 24, 36

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*,
478 U.S. 421 (1986) ... 28

*Local Union No. 1992 v. Okonite Co.*,
189 F.3d 339 (3d Cir. 1999) ... 14

*Mach Mining, LLC v. EEOC*,
135 S. Ct. 1645 (2015) ... 41

*Majors v. Abell*,
317 F.3d 719 (7th Cir. 2003) ... 21

*Medcom Holding Co. v. Baxter Travenol Labs.*,
200 F.3d 518 (7th Cir. 1999) ... 19

*NLRB v. Gen. Thermodynamics, Inc.*,
670 F.2d 719 (7th Cir. 1982) ... 38

*Occidental Life Ins. Co. v. EEOC*,
432 U.S. 355 (1977) ... 40, 41, 44

*Parisi v. Goldman, Sachs & Co.*,
710 F.3d 483 (2d Cir. 2013) ... 29

*Puffer v. Allstate Ins. Co.*,
675 F.3d 709 (7th Cir. 2012) ... 28, 37

*Reger Dev., LLC v. Nat'l City Bank*,
592 F.3d 759 (7th Cir. 2010) .................... 18

*Ribble v. Kimberly-Clark Corp.*,
No. 09-C-643, 2012 U.S. Dist. LEXIS 21822
(E.D. Wis. Feb. 22, 2012) .................... 15, 36

*Romero v. Allstate Ins. Co.*,
1 F. Supp. 3d 319, 396 (E.D. Pa. 2014) .................... 15, 42

*Romero v. Allstate Ins. Co.*,
3 F. Supp. 3d 313, 335 (E.D. Pa. 2014),
*aff'd*, *EEOC v Allstate Ins.*, 778 F.3d 444 (3d Cir. 2015) .................... 25

*Russello v. United States*,
464 U.S. 16 (1983) .................... 16

*Sauers v. Salt Lake Cnty.*,
1 F.3d 1122 (10th Cir. 1993) .................... 24

*Serrano v. Cintas Corp.*,
699 F.3d 884 (6th Cir. 2012) .................... 28, 48

*Sitar v. Indiana DOT*,
344 F.3d 720 (7th Cir. 2003) .................... 46

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) .................... 38

*United States v. Allegheny-Ludlum Indus., Inc.*,
517 F.2d 826 (5th Cir. 1975) .................... 48

*United States v. Bd. of Educ. for Sch. Dist. of Phila.*,
911 F.2d 882 (3d Cir. 1990) .................... 34

*United States v. City of Yonkers*,
592 F. Supp. 570 (S.D.N.Y. 1984) .................... 42

*United States v. Fresno Unified Sch. Dist.*,
592 F.2d 1088 (9th Cir. 1979) .................... 48

*United States v. Gulf-State Theaters, Inc.*,
256 F. Supp. 549 (N.D. Miss. 1966) .................... 33, 34

*United States v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*,
438 F.2d 679 (7th Cir. 1971) .................... 28

*United States v. Lansdowne Swim Club*,
894 F.2d 83 (3d Cir. 1990) ........ 33

*United States v. New Jersey*,
473 F. Supp. 1199 (D.N.J. 1979) ........ 42

*United States v. North Carolina*,
587 F.2d 625 (4th Cir. 1978) ........ 43

*United States v. Original Knights of the Ku Klux Klan*,
250 F. Supp. 330 (E.D. La. 1965) ........ 33, 34

*United States v. Sampson*,
256 F. Supp. 470 (N.D. Miss. 1966) ........ 33

*Util. Air Regulatory Grp. v. EPA*,
134 S. Ct. 2427 (2014) ........ 36, 37

*Virginia v. Am. Booksellers Ass'n, Inc.*,
484 U.S. 383 (1988) ........ 21

*Vitarelli v. Seaton*,
359 U.S. 535 (1959) ........ 44

*Young v. United Parcel Serv., Inc.*,
135 S.Ct. 1338 (2015) ........ 43

STATUTES

29 U.S.C. § 158(a)(1) ........ 38

42 U.S.C. § 2000e-2 (§ 703 of the Civil Rights Act of 1964) ........ 24

42 U.S.C. § 2000e-3 (§ 704 of the Civil Rights Act of 1964) ........ 16

42 U.S.C. § 2000e-4 (§ 705 of the Civil Rights Act of 1964) ........ 26

42 U.S.C. § 2000e-5 (§ 706 of the Civil Rights Act of 1964) ........ *passim*

42 U.S.C. § 2000e-6 (§ 707 of the Civil Rights Act of 1964) ........ *passim*

42 U.S.C. § 2000e-8 (§ 709 of the Civil Rights Act of 1964) ........ 47, 50

OTHER AUTHORITIES

29 C.F.R. § 1601.1 ........ 43, 49

29 C.F.R. § 1601.21 ........ 44, 50

29 C.F.R. § 1601.24 .................... 44, 49, 50

29 C.F.R. § 1601.25 .................... 44, 50

29 C.F.R. § 1601.26 .................... 44, 50

29 C.F.R. § 1601.27 .................... 44, 50

110 Cong. Rec. 12,722 (1964) .................... 29

110 Cong. Rec. 12,596 (1964) .................... 29

110 Cong. Rec. 14,189 (1964) .................... 29

110 Cong. Rec. 14,191 (1964) .................... 30

110 Cong. Rec. 15,895 (1964) .................... 30

118 Cong. Rec. 4081 (1972) .................... 30

40 Fed. Reg. 16193 (Apr. 10, 1975) .................... 49, 50

44 Fed. Reg. 4667 (Jan. 23, 1979) .................... 50

EEOC, *Enforcement Guidance on Non-Waivable Employee Rights*, Notice No. 915.002 (Apr. 10, 1997), http://www.eeoc.gov/policy/docs/waiver.html .................... 14

EEOC, *Retaliation Fact Sheet*, http://www. eeoc.gov/laws/types/facts-retal.cf .................... 16

EEOC, *Understanding Waivers of Discrimination Claims In Employee Severance Agreements*, § III, http://www.eeoc.gov/policy/docs/qanda_severance-agreements.html .................... 32

U.S. Justice Department, *Employment Section Overview*, http://www.justice.gov/crt/about/emp/overview.php .................... 31

*Hr'gs Before H. Comm. on Judiciary on H.R. 10327*, 86th Cong., 2d Sess. 13 .................... 33

H.R. Rep. 92-238 (1971) .................... 30, 42

S. Rep. 92-681 (1972) .................... 47

S. Rep. 92-415 (1971) .................... 30

Statement of Jenny R. Yang to Sen. Comm. on Health, Educ., Labor & Pensions at 2, May 19, 2015, http://www.help.senate.gov/imo/media/doc/Yang.pdf .......................................... 41

Statement of P. David Lopez to Sen. Comm. on Health, Educ., Labor & Pensions at 6, May 19, 2015, http://www.help.senate.gov/imo/media/doc/Lopez3.pdf; ...................................... 41

Erica Teichert, *EEOC Says Social Media Discovery Scares Plaintiffs Away*, LAW360 (Mar. 12, 2014) ........................................................................ 36

## JURISDICTIONAL STATEMENT

CVS Pharmacy, Inc. ("CVS") submits that the jurisdictional statement of the Equal Employment Opportunity Commission ("EEOC") is complete and correct.

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly held that EEOC's suit was unauthorized because EEOC filed it without satisfying the pre-suit process required by Title VII of the Civil Rights Act of 1964 and EEOC's own regulations.

2. Whether EEOC states a claim of a "pattern or practice" of intentional "resistance" to "the rights secured by" Title VII by alleging that "legalese" in a severance agreement might cause those who signed the agreement to mistakenly believe that they cannot participate in EEOC proceedings.

## STATEMENT OF THE CASE

This case involves a standard severance agreement that CVS executed with certain former employees. Like most severance agreements, it includes releases, covenants not to sue, non-disclosure commitments, and other provisions to protect the employer's interests—in exchange for consideration to which the employee otherwise has no entitlement. The agreement is clear that it (i) does not release any non-waivable rights; (ii) does not interfere with the right to participate in EEOC proceedings; and (iii) does not preclude the signatory from truthful testimony or truthful disclosures required by law or legal process.

EEOC's unprecedented theory is that use of this agreement constitutes a "pattern or practice" of intentional "resistance" to "the rights secured by" Title VII, 42 U.S.C. § 2000e-6, even though CVS concededly did not commit *any* unlawful

employment practices under Title VII (which prohibits employment discrimination and retaliation). EEOC says that CVS's agreement violates Title VII because it is "confusing" and may lead former employees to believe they are barred from filing EEOC charges or talking to EEOC, which they are not. That speculative "chilling effect"—which EEOC does not allege actually deterred *anyone* from participating in *any* proceeding—is enough, it claims, to establish pattern-or-practice liability.

The District Court expressed deep skepticism of EEOC's claim and rejected both its construction of the severance agreement and its interpretation of Title VII's pattern-or-practice provision. But ultimately, the Court dismissed on another ground: because EEOC failed to satisfy the pre-suit requirement to first offer to reach a confidential settlement. Indeed, EEOC refused to engage in conciliation even though CVS repeatedly pleaded with EEOC to discuss voluntary resolution, suggested mediation, and indicated that it was clarifying its agreement's terms.

**1. CVS Offered Severance Agreements That Expressly Preserved Former Employees' Rights To Participate in EEOC Proceedings.**

EEOC's complaint centers on CVS's alleged use, "since at least August 2011" (App.10) of a severance agreement ("Agreement") that includes a number of standard provisions typically found in severance agreements. App.17-21.

*Release.* Section 7 of the Agreement contains a broad release of all waivable claims. It first provides that the former employee "releases" CVS from any "causes of action, lawsuits, proceedings, complaints, charges, debts, contracts, judgments, damages, claims, and attorneys fees" arising prior to execution of the Agreement. App.18. It then adds that, "[n]otwithstanding the foregoing, this release does not

include any rights that Employee cannot lawfully waive," or three other specific categories of rights (namely, indemnification rights, rights under the Agreement itself, or rights to vested pension benefits). *Id.*

*Covenant Not To Sue.* Section 8 represents that the former employee *has not* filed and *will not* file any "action, lawsuit, complaint or proceeding" asserting any released claims. App.18. It includes two caveats. First, the Agreement does not "interfere with" the employee's right to challenge compliance with specific waiver requirements found in the federal age discrimination statute. *Id.* Second:

> Nothing in this paragraph is intended to or shall interfere with Employee's right to participate in a proceeding with any appropriate federal, state or local government agency enforcing discrimination laws, nor shall this Agreement prohibit Employee from cooperating with any such agency in its investigation.

*Id.* In such a case, the former employee is merely precluded from "receiv[ing] any relief" (*e.g.*, damages) through that proceeding. *Id.*

*Non-Disclosure and Non-Disparagement.* In a subsequent paragraph that details "Employee Covenants," the Agreement represents that the employee has not improperly used or disclosed "Confidential Information" belonging to CVS. App.19 (Agreement, § 13(a)). The covenant also commits the former employee not to use or disclose such information in the future "without the prior written authorization" of CVS. *Id.* Another covenant forbids "any statements that disparage the business or reputation" of CVS—but clarifies that, "[n]otwithstanding the foregoing, nothing in this Agreement shall prohibit Employee from (i) making truthful statements or disclosures that are required by applicable law, regulation or legal process; or (ii) requesting or receiving confidential legal advice." App.20 (Agreement, § 13(d)).

*Cooperation.* The Agreement requires cooperation, in certain respects, in future legal proceedings. Specifically, the signatory agrees "to promptly notify" CVS on receipt of a "subpoena, deposition notice, interview request, or any other inquiry, process or order" related to CVS. App.20 (Agreement, § 13(e)(i)). In such a case, the recipient must cooperate with CVS to protect confidential company information. *Id.* The former employee must also cooperate with CVS in any "action, proceeding, or dispute" arising out of work for the company, *e.g.*, by meeting with the company's counsel or appearing for depositions (subject to reimbursement of costs by CVS). *Id.* (Agreement, § 13(e)(ii)). If CVS obtains injunctive or monetary relief for breach of this covenant or the non-disclosure or non-disparagement covenants, the former employee agrees to reimburse the company for its "reasonable attorneys fees" in connection with that effort. App.20 (Agreement, § 14).

*Consideration.* In exchange for these covenants, CVS commits to severance pay, to subsidize the former employee's health insurance during the severance period, and to offer certain "outplacement assistance." App.17 (Agreement, §§ 2, 3, 5). The former employee would otherwise have no right to any of those benefits.

*Legal Advice.* To ensure that the former employee understands the terms of the Agreement, the Agreement notes that CVS "advises Employee to seek the advice of legal counsel concerning this Agreement before signing," and represents that the employee "had the opportunity to do so prior to signing this Agreement." App.18 (Agreement, § 10). Moreover, the Agreement offers 21 days to consider whether to sign, and a 7-day revocation period thereafter. *Id.* (Agreement, § 11).

*Rest of Agreement*. As EEOC's complaint notes, the Agreement is a "*five-page single spaced*" contract. App.11 (emphasis in original). (It actually spans four-and-a-half pages.) The other portions of the Agreement contain provisions relating to the Family and Medical Leave Act and Fair Labor Standards Act; various acknowledgements to satisfy the Older Workers Benefit Protection Act's specific waiver requirements; a choice-of-law provision; a mutual waiver of jury trial rights; a severability clause; and an "entire agreement" clause. *See* App.17-21.

**2. When a Former CVS Employee Filed a Discrimination Charge with EEOC, the Agency Dismissed the Charge, but an EEOC Attorney Found "Reasonable Cause" Arising from CVS's Severance Agreement.**

In July 2011, CVS discharged a store manager, Tonia Ramos. R.28, EEOC Response to Statement of Undisputed Material Facts ("SUMF Resp."), ¶ 5. Ramos executed the severance agreement described above. *Id.*, ¶ 6. A month later, in August 2011, Ramos filed a charge with EEOC, alleging that CVS discharged her because of her race and sex. *Id.*, ¶ 7.

In April 2012, during EEOC's investigation of Ramos's charge, CVS provided EEOC with Ramos's severance agreement, and later provided further information about its severance agreements, including how many other employees were offered similar terms. R.17-1 at 20-39, McConnell Aff. Exhs. E, F, & G.

In June 2013, an EEOC regional attorney issued notice to CVS that he "has reasonable cause to believe that [CVS] is engaged in a pattern or practice of resistance to the full enjoyment of the rights secured by Title VII … and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights described in Title VII." R.17-1 at 41, McConnell Aff. Exh. H. The letter

said that CVS "conditioned employees' receipt of severance pay on an overly broad, misleading and unenforceable" agreement that "interferes with employees' right to file charges with the EEOC, … communicate with the EEOC …, and participate in EEOC … investigations." *Id.* Three days later, EEOC dismissed Ramos's charge, and wrote that it was "unable to conclude that the information obtained establishes violations of the statutes." R.17-1 at 45, McConnell Aff. Exh. I.

**3. Despite CVS's Entreaties and Willingness To Clarify the Severance Agreement's Language, EEOC Refused to Conciliate Its "Pattern or Practice" Claim Before Filing Suit.**

Rather than try to conciliate, EEOC's regional attorney demanded that CVS indicate "within fourteen (14) days" whether it would agree to a consent decree, "to be filed with the court," under which CVS would discontinue use of its Agreement and expressly say in any future agreement that the employee "retain[s] the right to file charges" and "recover monetary relief … in any action by the EEOC" and may also communicate and cooperate with EEOC, regardless of any non-disparagement or confidentiality obligations. EEOC further demanded that this decree toll Title VII's charge-filing period for former employees who signed the Agreement; that CVS issue a "corrective communication"; and that its personnel be given "[t]raining." R.17-1 at 41-42, McConnell Aff. Exh. H.

On July 29, 2013, CVS asked EEOC to "comply with the pre-suit procedures contained in Title VII," including the confidential conciliation required by the law, and offered to mediate. R.17-1 at 49-50, McConnell Aff. Exh. J. EEOC, however, refused to participate in pre-suit conciliation, and insisted that any settlement be memorialized in a public consent decree *after* it sued. R.28, SUMF Resp., ¶ 11. By

telephone and in a letter dated August 1, 2013, CVS repeatedly pleaded with EEOC to try to resolve the dispute through conciliation, as required, and protested "any public proceeding by EEOC without any pre-suit attempt at conciliation." R.17-1 at 52-53, McConnell Aff. Exh K. CVS indicated that it "is implementing changes to its release agreements to enhance the existing language to ensure that employees understand their rights to file a charge with the EEOC and to cooperate fully with EEOC," and again offered to enter a reasonable conciliation agreement. *Id.* EEOC never responded. Instead, more than six months later, it filed suit. R.1, Complaint.

**4. The District Court Granted CVS's Dispositive Motion.**

CVS filed a motion to dismiss or for summary judgment. R.15, Motion. It argued that EEOC's claim failed as a matter of law, since the Agreement does *not* interfere with the right to file EEOC charges or participate in EEOC proceedings; and, if it did, that would at most render portions of the Agreement unenforceable. It would not constitute a pattern-or-practice violation of Title VII. R.16, Mem. of Law, at 11-23. The motion also argued that summary judgment was warranted because EEOC refused to satisfy its pre-suit duties. *Id.*, at 23-27.

The District Court granted summary judgment to CVS. App.1-9. The Court noted that EEOC's claim sought "to expand the meaning" of Title VII's pattern-or-practice provision, which, when properly construed, "requires some retaliatory or discriminatory act" by the defendant. App.4 n.2. The Court further noted that while EEOC alleges that the Agreement "deters the filing of charges and interferes with the employee's ability to communicate voluntarily with the EEOC," it actually contains "a specific carve out" *allowing* participation in proceedings before anti-

discrimination agencies, and so it "is not reasonable to construe" the Agreement to prohibit charge-filing. App.4 & n.3. Moreover, the Court observed that even if the Agreement barred charge-filing, "those provisions would be unenforceable and could not constitute resistance to the Act." App.4 n.3. Both points echoed CVS's motion.

Ultimately, the court granted summary judgment because EEOC refused to attempt to conciliate its claim before filing suit, contrary to Title VII and EEOC regulations. As the Court explained, when Congress in 1972 transferred authority under § 707 of the Civil Rights Act, 42 U.S.C. § 2000e-6, from the Attorney General to the EEOC, Congress provided EEOC with "authority to investigate and act on a charge of a pattern or practice of discrimination," and mandated that "[a]ll such actions shall be conducted in accordance with the procedures set forth in" § 706, 42 U.S.C. § 2000e-5. App.5. Those "procedures" include the requirement that EEOC, before bringing suit, "endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b). In short, the amendments "did not authorize the EEOC to forego the procedures in Section 706." App.8. "Moreover, the EEOC's own regulations require the agency to use informal methods of eliminating an unlawful employment practice where it has reasonable cause to believe that such a practice has occurred or is occurring." *Id.*

Because it was "undisputed that the EEOC did not engage in any conciliation procedure" here, EEOC "was not authorized to file this suit," and the Court granted judgment as a matter of law to CVS. App.8-9.

## SUMMARY OF ARGUMENT

EEOC argues that the District Court erred because the "conciliation procedures of Section 706" do not apply to pattern-or-practice claims it pursues "on its own initiative" under § 707. (EEOC.Br.13-14.) EEOC additionally argues that "summary judgment is further unwarranted because a reasonable trier of fact could find" that CVS's Agreement "constitutes an actionable pattern or practice of resistance" to Title VII rights. (EEOC.Br.14.) EEOC is wrong on both points; affirmance is therefore doubly warranted. Indeed, on both issues, EEOC is taking positions directly contrary to Title VII's text, history, and consistent caselaw, and that contradict even EEOC's own prior statements, including binding regulations. Since EEOC's error regarding the procedures applicable to § 707 claims builds on its erroneous view of § 707's substantive scope, CVS begins with the latter point.

**I.** EEOC's novel theory is that CVS's severance agreement is "legalistic and confusing," and purportedly creates a "chilling effect" that might prevent CVS's former employees from filing EEOC charges or otherwise working with the agency. (EEOC.Br.14.) That *hypothetical effect*, the agency says, establishes an *intentional* "pattern or practice of resistance to the full enjoyment" of Title VII rights. (*Id.*)

That broad, unprecedented theory fails as a matter of law for at least three independent reasons. *First*, its premise is flatly false. CVS's Agreement does not, on any fair reading, prohibit or interfere with EEOC charge-filing or any other sort of cooperation with EEOC. To the contrary, the Agreement contains an express carve-out, clarifying that it shall *not* "interfere with Employee's right to participate

in a proceeding with any appropriate federal, state or local government agency enforcing discrimination laws, nor shall this Agreement prohibit Employee from cooperating with any such agency in its investigation." App.18 (Agreement, § 8). The Agreement thus specifically authorizes participation in and cooperation with EEOC investigations and proceedings. EEOC suggests that the scope of this carve-out is "confusing," but that is pure—and baseless—speculation. The only record evidence is that Ramos had no qualms about filing a charge just a few weeks after she signed the Agreement—and suffered no retribution for doing so.

*Second*, even if the Agreement did purport to interfere with charge-filing or cooperation with the EEOC, it would at most be *unenforceable*. It still would not violate Title VII's pattern-or-practice provision, which simply authorizes EEOC to proceed using a class action-style proof framework against those who *repeatedly* engage in unlawful employment practices forbidden by Title VII, *i.e.*, discrimination and retaliation. Every court to consider this power, including this Court, has so described it; Title VII's text and legislative history are in accord; and EEOC and the U.S. Department of Justice have long taken the same view. Yet EEOC does not allege that CVS *ever* discriminated or retaliated against *anyone*, because courts have consistently rejected such claims in analogous circumstances. Its theory thus turns pattern-or-practice liability on its head—instead of being directed at the *worst, repeat* violators, EEOC would invoke it against conduct that *no* court has *ever* held unlawful. This Court should reject EEOC's attempt to turn itself into a roving commission with the power to enjoin any otherwise-lawful conduct it deems "bad."

*Third*, even if the Agreement "chilled" cooperation with EEOC, and even if a pattern-or-practice claim could exist without any substantive violation, EEOC's claim here is still legally baseless. A pattern-or-practice must be *intended* to interfere with Title VII rights. Yet EEOC's theory is simply that CVS's Agreement is inartfully worded and uses confusing "legalese." Even if so, there is no plausible allegation that CVS drafted it—with its express carve-out for EEOC proceedings, its suggestion that signatories seek legal advice, and its 21-day waiting period and 7-day revocation period to ensure they do so—as part of some sinister scheme to sow confusion over employees' EEOC rights. Yet that absurd proposition is the *least* that EEOC must prove to prevail.

**II.** EEOC's claim is also procedurally improper. When Congress extended litigating authority to EEOC in 1972, it made clear that litigation must be a last resort—*after* failure of attempts to resolve the matter privately. Congress at the same time transferred to EEOC the Attorney General's power to pursue pattern-or-practice discrimination claims, but further directed that it act on such charges "in accordance with" procedures applicable to claims under § 706 of the Act, including confidential conciliation. Thus, as EEOC itself has told other courts, and as those courts have found, conciliation must precede *all* EEOC litigation.

Indeed, EEOC admits that pre-suit procedures are required if it acts on a "charge" of a pattern-or-practice of "discrimination." But, despite Ramos's charge, EEOC says this case is different because it acted *without* a charge and alleges *no* discrimination. There is nothing to commend that revisionist reading, which

perverts the statutory scheme and finds no support in legislative history or caselaw. Why should the agency have *greater* leeway when it dismisses a charge (as here) or declines to initiate one, or when it alleges a "pattern or practice" that does not even amount to discrimination? The provision transferring § 707 authority to EEOC speaks of charges, which aggrieved persons *or* EEOC Commissioners may file, because that is how *all* EEOC investigations are triggered. And it speaks of a pattern-or-practice of "discrimination" because, contrary to EEOC's unbounded theory here, that is what Title VII protects against. EEOC's refusal to conciliate this case is thus a doubling-down on its baseless notion that it can prove a pattern-or-practice without any substantive Title VII violations.

Even if Title VII did not mandate conciliation here, EEOC's own regulations do. The regulations govern *all* EEOC Title VII actions and provide, without any qualification, that EEOC will try to conciliate before bringing suit. EEOC ignored those regulations before the District Court, and accordingly waived any argument about them. It now claims the regulations do not govern, because they apply to a subset of EEOC cases—only those that allege "unlawful employment practices"—and that it has vast *other* powers that go entirely unmentioned in its comprehensive regulations and that it apparently only recently discovered. The regulations' plain text and history, not to mention common sense, squarely refute that contention—which, coming full circle, underscores again why EEOC has not stated any legally viable claim against CVS in the first place.

## ARGUMENT

### I. CVS'S SEVERANCE AGREEMENT IS NOT A "PATTERN OR PRACTICE" OF INTENTIONAL "RESISTANCE" TO TITLE VII RIGHTS.

EEOC's claim is that CVS's Agreement has the effect of interfering with its former employees' rights to cooperate with the agency, and therefore represents—on its face—a pattern-or-practice violation of Title VII. This claim fails as a matter of law because (i) it misreads and distorts the Agreement's terms; (ii) it rests on an erroneous, countertextual, overbroad, unprecedented understanding of Title VII's pattern-or-practice provision; and (iii) it ignores that a critical element of a pattern-or-practice claim, under any construction of the statute, is *intent*, which cannot be plausibly alleged here. For any of these independent reasons, the judgment below should be affirmed.

#### A. EEOC's Premise Is False, Because the Agreement Permits Former Employees To Participate and Cooperate in EEOC Proceedings.

EEOC's premise is that CVS's Agreement interferes with the right to file EEOC charges and participate in EEOC proceedings. That premise is false. The Agreement does not preclude or forbid anyone from exercising those rights. To the contrary, it expressly permits that conduct, and EEOC's complaint does not allege that *anyone* ever believed otherwise. Such a belief would not even be *reasonable* in light of the contractual language—and surely not after the District Court reiterated that the Agreement permits all participation in EEOC proceedings. There is thus no basis for the foundation of EEOC's Title VII claim—*i.e.*, its speculation that the Agreement inhibits cooperation with it.

1. EEOC first objects to the provisions that require the former employee to release all waivable claims against CVS, and to agree not to sue CVS subject to certain exceptions. (EEOC.Br.42-45.) But there is no dispute that Title VII claims *can* be released, and the covenant not-to-sue expressly permits participation in proceedings before agencies that enforce anti-discrimination laws, like EEOC. These provisions therefore do not remotely implicate former employees' ability to work with EEOC.

Section 7 of the Agreement broadly releases claims against CVS, including under Title VII. This is "a common provision in modern severance agreements," *Local Union No. 1992 v. Okonite Co.*, 189 F.3d 339, 348 (3d Cir. 1999); it is "well-established" that "employers can require releases in exchange for post-termination benefits," *EEOC v. Allstate Ins. Co.*, 778 F.3d 444, 449 (3d Cir. 2015). Even EEOC admits that a "private agreement can eliminate an individual's right to personal recovery." EEOC, *Enforcement Guidance on Non-Waivable Employee Rights*, Notice No. 915.002 (Apr. 10, 1997), http://www.eeoc.gov/policy/docs/waiver.html; *see also EEOC v. Cosmair, Inc., L'Oreal Hair Care Div.*, 821 F.2d 1085, 1091 (5th Cir. 1987) ("[T]he employee can waive not only the right to recover in his or her own lawsuit but also the right to recover in a suit brought by the EEOC on the employee's behalf."). Indeed, if one could not release a claim of discrimination, none could be settled out of court—which is absurd, particularly given Congress's "preference for encouraging voluntary settlement of employment discrimination claims." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).

EEOC's suggestion that the release interferes with the filing of charges is meritless, for three reasons. *First*, the release does not prohibit former employees from doing *anything*, including filing an EEOC charge; it simply grants CVS "an effective affirmative defense" and thereby allows it to win a suit "should a claim be raised." *Isbell v. Allstate Ins. Co.*, 418 F.3d 788, 797 (7th Cir. 2005). So there is no fair reading of the release that would stop a former employee from filing a charge. *Second*, consistent with EEOC's own suggested *sample* release (EEOC.Br.44 n.11), the Agreement's release carves out rights that one "cannot lawfully waive." App.18 (Agreement, § 7). So if, as EEOC argues and some courts have held (EEOC.Br.39), employees cannot waive their right to file EEOC charges, then the release by its terms does not affect that right. As such, releases that use such a caveat "do not prohibit employees from filing EEOC charges." *Ribble v. Kimberly-Clark Corp.*, No. 09-C-643, 2012 U.S. Dist. LEXIS 21822, at *20-24 (E.D. Wis. Feb. 22, 2012). *Third*, while the release applies not only to "causes of action, lawsuits, proceedings," etc., but also "charges," courts recognize that, "when taken in context," that term "is easily understood … to constitute legal charges filed in a court of law," not EEOC charges. *Romero v. Allstate Ins. Co.*, 1 F. Supp. 3d 319, 396 (E.D. Pa. 2014).

Indeed, even EEOC cannot truly find fault with the Agreement's release, so instead it complains only that when "taken together" with the covenant not-to-sue, the release might "confuse" a former employee about whether he may file a charge. (EEOC.Br.44.) But the covenant not-to-sue—which *does* prohibit certain actions—*specifically stipulates* that it does not "interfere with Employee's right to participate

in a proceeding with any appropriate federal, state, or local government agency enforcing discrimination laws, nor shall this Agreement prohibit Employee from cooperating with any such agency in its investigation." App.18 (Agreement, § 8). That proviso squarely *preserves* the right to participate in an EEOC proceeding.

The sole purported ambiguity that EEOC identifies is whether filing a charge with EEOC counts as "participat[ing] in a proceeding" before it. (EEOC.Br.44-45.) It plainly does. *First*, as the court below observed, "'participate' is a broad term." App.4 n.3. To participate is to "be involved with" something or "take part" in it. *Id.* (quoting a dictionary); *see also Russello v. United States*, 464 U.S. 16, 21-22 (1983) (describing "participate" as term of "breadth"). EEOC's dichotomy between filing a charge versus "participating" in an EEOC proceeding is wholly implausible given that filing a charge is the *first step* in any such proceeding. *Second*, Title VII itself refers to filing a charge as a form of participation: Charge-filing is protected under the anti-retaliation provision's "participation clause," precisely because it involves "participation" in EEOC proceedings. 42 U.S.C. § 2000e-3(a); *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 274 (2009). Indeed, EEOC's own website provides a list of "[e]xamples of participation," the first of which is: "Filing a charge of employment discrimination." EEOC, *Retaliation Fact Sheet*, http://www.eeoc.gov/laws/types/facts-retal.cfm. *Third*, unlike the release, the covenant not-to-sue does *not* extend to "charges"—it applies only to a "complaint, claim, action or lawsuit." App.18 (Agreement, § 8). That disparate, limited language confirms that the covenant does not bar EEOC charge-filing.

In short, it is simply "not reasonable" (App.4 n.3) to construe these terms as impairing the right to file an EEOC charge. EEOC's contrary contentions reflect implausible, strained constructions of the contract that nobody has ever expressed, adopted, or acted upon. This Court should not indulge them.

2. EEOC next argues that sections 13 and 14 of the Agreement are "even more deeply problematic." (EEOC.Br.45.) By requiring that CVS authorize any disclosure of confidential corporate information, prohibiting disparagement of the company, and compelling certain cooperation in future litigation, EEOC claims that the Agreement threatens anyone who cooperates with it—a threat exacerbated by the provision allowing CVS to recover attorneys' fees in successful actions to enforce these covenants. (EEOC.Br.45-47.) Again, however, these allegations ignore the Agreement's clear carve-out for EEOC proceedings, and do not withstand scrutiny.

Covenants that protect employers against release of confidential information or disparagement by former employees are, like releases, ubiquitous and legitimate. No employer, after all, "want[s] to be badmouthed by a disgruntled employee who may be privy to the employer's dark secrets." *EEOC v. Severn Trent Servs., Inc.*, 358 F.3d 438, 440 (7th Cir. 2004). Such clauses are no cause for concern, unless actually invoked to prevent the signatories from cooperating with investigations. *See id.* at 442-43 (finding non-disparagement clause "no cause for an injunction" unless there was "evidence" of employer intent "to intimidate potential witnesses").

Here, the Agreement cannot be read to prohibit signatories from cooperating with EEOC investigations. As discussed above, the Agreement earlier contains an

express caveat that "this Agreement" shall *not* "prohibit Employee from cooperating with any such agency [enforcing discrimination laws] in its investigation." App.18 (Agreement, § 8). The contract, of course, must be read "as a whole," not by looking "at any one contract provision in isolation." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010). And, as a matter of basic contract law—and common sense—a "more specific provision of a contract governs where it arguably conflicts with a more general provision." *Aeroground, Inc. v. CenterPoint Props. Trust*, 738 F.3d 810, 813 (7th Cir. 2013). The general non-disclosure and non-disparagement covenants thus cannot be construed as superseding by implication the Agreement's specific, express clarification that it does not "prohibit Employee from cooperating with any such agency." Rather, to the extent that the former clauses are "general enough to include the specific situation to which the [latter] is confined, 'the specific provision will be deemed to qualify the more general one.'" *Id.* at 816.

Moreover, even setting aside the authorization to participate in EEOC proceedings, these covenants do not, on their own terms, preclude anyone from speaking with EEOC. The cooperation provision simply requires *notification* to CVS of a subpoena, deposition notice, etc., to give the company an opportunity to raise objections before disclosing confidential information, as well as truthful testimony on the company's behalf if requested. App.20 (Agreement, § 13(c)(i)). Similarly, the non-disclosure covenant merely requires signatories to seek CVS's authorization before disclosing confidential material. App.19 (Agreement, § 13(a)). While, in theory, a refusal to authorize disclosure to EEOC could raise concerns,

that is purely hypothetical (EEOC has not alleged that this ever occurred), and the requirement to seek authorization is not, alone, a barrier to communication. As for the non-disparagement covenant, it expressly provides that notwithstanding the general prohibition, "nothing in this Agreement shall prohibit Employee from … making truthful statements or disclosures that are required by applicable law, regulation or legal process." App.20 (Agreement, § 13(d)). While EEOC may prefer to avoid the minor burden of issuing a subpoena (EEOC.Br.46 n.12), the non-disparagement provision, even if examined in isolation, clearly authorizes open communication through that avenue, which this Court has previously "urge[d]" EEOC to take. *Severn Trent*, 358 F.3d at 445. Any confused former employee who wants to disparage CVS to EEOC can simply ask EEOC to issue a subpoena.

In short, EEOC's allegations about these covenants ignore both (i) the specific contractual provision that expressly permits cooperation with EEOC, and (ii) the actual language of the covenants, which protect CVS's legitimate interests without compromising former employees' rights to speak with EEOC. As such, there is also nothing wrong with the derivative provisions authorizing CVS to recover costs and fees in case of a breach. *Cf. EEOC v. SunDance Rehabilitation Corp.*, 466 F.3d 490, 492 (6th Cir. 2006) (rejecting challenge to agreement with fee-shifting provision, despite inclusion of *express* charge-filing ban). Indeed, this Court often enforces contractual fee-shifting provisions, without doubting their legality. *E.g.*, *Medcom Holding Co. v. Baxter Travenol Labs.*, 200 F.3d 518, 520-21 (7th Cir. 1999).

3. EEOC's construction of the Agreement would never be adopted by any court. It therefore focuses not on how the Agreement should properly be construed, but rather on how someone might find it "confusing." (EEOC.Br.45.) Ambiguity, suggests EEOC, creates a "risk" or "Hobson's choice" for a signatory considering whether to cooperate, and thus operates as a deterrent. (EEOC.Br.46.) Even this watered-down "chilling effect" premise fails.

*First*, for all of the reasons discussed above, no reasonable employee would understand the Agreement—which expressly preserves the right to participate in a proceeding before an anti-discrimination agency, and cooperate with investigations by that agency—as actually foreclosing those rights. At most, a former employee may choose to seek authorization or suggest a subpoena if confidential information is at stake. But there is no basis to speculate that the Agreement would cause those who otherwise want to cooperate with EEOC "to keep [their] mouth[s] shut" entirely. (EEOC.Br.46.) Contrary to EEOC's suggestion, this Agreement is therefore nothing like the one in *EEOC v. Astra USA, Inc.*, which on its face committed employees "not to file a charge with the EEOC" or even to "assist others who file charges." 94 F.3d 738, 741 (1st Cir. 1996). While the employer there tried to "reinterpret" its agreement during litigation, the court refused to "indulg[e]" that revisionism in light of the contract's plain text. *Id.* at 745. Here, the plain language of CVS's Agreement does *not* "materially interfer[e]" with employee-EEOC communications; it is *EEOC* engaging in revisionism. *Id.* at 744.

*Second*, EEOC has not even alleged, much less adduced any evidence to be considered by a "reasonable fact-finder" (EEOC.Br.51), that the Agreement ever "confused" *anyone* or that anyone ever misunderstood it to preclude filing a charge or communicating with EEOC. Nor has EEOC alleged that CVS ever so construed the Agreement or took that position vis-a-vis any signatory. Its claim of a "chilling effect" is therefore purely hypothetical—again, in stark contrast to the cases that it cites. *E.g.*, *Astra*, 94 F.3d at 745 ("The district court supportably found that these agreements had in fact chilled communications between the settling employees and the EEOC."). Indeed, the only evidence in the record is that Ramos—who signed the Agreement—was not deterred in the slightest from filing an EEOC charge just a few weeks later. R.28, SUMF Resp., ¶¶ 5-7. And there is no evidence that she was subjected to any consequences for doing so. EEOC's claim is thus founded on mere speculation—worse, speculation at odds with the record.

*Third*, even in the First Amendment context, where "chilling" effects are of constitutional magnitude, a statute that could on its face be read broadly to infringe on freedom of expression is nonetheless upheld if it is "'readily susceptible' to a narrowing construction" that would avoid the infringement—and certainly if such a construction has been "authoritative[ly]" adopted. *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 395-97 (1988); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973) (holding that a "limiting construction" can narrow the statute "as to remove the seeming threat or deterrence to constitutionally protected expression"); *Majors v. Abell*, 317 F.3d 719, 724 (7th Cir. 2003) (same).

Here, even if a reasonable employee *could* read the Agreement to prohibit charge-filing or communications with EEOC, the Agreement is plainly susceptible to a narrower reading. Indeed, the District Court *has already adopted* the latter construction, App.4 n.3 (which this Court could make "authoritative" by affirming). Moreover, CVS adopted the same construction in this litigation, such that "it would unquestionably be estopped" from later seeking to enforce a broader interpretation. *Severn Trent*, 358 F.3d at 444; *see also EEOC v. CollegeAmerica Denver, Inc.*, No. 14-cv-1232, 2014 U.S. Dist. LEXIS 167055, at *9 (D. Colo. Dec. 2, 2014) (rejecting challenge to separation agreement because defendant's representations established it would not use agreement "to interfere with" ADEA rights). EEOC's premise that the Agreement deters conduct that both the District Court and CVS have stipulated (based on a sensible construction) it does *not* prohibit is therefore legally incredible. These *speculative* chilling effects *on EEOC charge-filing* do not deserve greater solicitude than *actual* chilling effects on *constitutionally protected expression*.[1]

* * *

It is true that CVS's Agreement is (almost) "five pages long." (EEOC.Br.42.) Termination of employment entails a variety of legal consequences that legitimately warrant treatment in such a contract. It is true that portions of the Agreement may

[1] EEOC's position appears to be that CVS's employees are ignorant of the law, such that even adoption of a narrowing construction would not avoid the chilling effect of the Agreement's supposed ambiguity. (EEOC.Br.51.) But the same would be true of those subject to speech-suppressing laws. The Supreme Court nonetheless held that a narrowing construction "remove[s] the seeming threat or deterrence." *Broadrick*, 413 U.S. at 613. If EEOC is worried that employees are ignorant of their Title VII rights, it may surely seek to better inform them—but courts cannot presume such ignorance.

be characterized as "legalese." (*Id.*) Such is the nature of modern legal drafting. *See Balcor Real Estate Holdings, Inc. v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996) ("Perhaps this is just prolix, redundant, reiterative, repetitive, tautological, windy, and wordy."). It is also true that the Agreement is "single-spaced" and in smaller font than this brief (though that cuts *against* the theory that CVS drafted it in order to send a clear warning). But, in the end, none of that has any bearing on EEOC's premise—that the Agreement deters cooperation with the agency. That premise is foreclosed by basic principles of contract interpretation; superseded by the District Court's narrow construction; and rebutted by the record evidence. EEOC's claim fails with it.

### B. EEOC Cannot State a "Pattern or Practice" Claim Without Alleging That CVS Ever Committed *Any* Unlawful Employment Practices.

EEOC's claim also fails because, whatever the Agreement's true meaning (or perceived meaning), it cannot and does not constitute a pattern-or-practice violation of Title VII. To be sure, contracts that purport to interfere with EEOC charge-filing or the like may well be unenforceable—void on public policy grounds. But they are not independently actionable under Title VII. That statute prohibits discrimination; it prohibits retaliation; and it allows EEOC to pursue egregious, repeat violators using a class action-like pattern-or-practice proof framework. That is how Congress explained the scheme; it is how every court has construed it; and it is how EEOC and the Justice Department have long understood it. The notion that § 707 permits EEOC to sue absent *any* discrimination, by asserting hypothetical "chilling effects," is both utterly unprecedented and dangerously unbounded.

1. At the outset, it is important to make clear that EEOC does *not* allege here any discrimination or retaliation. Two sections of Title VII, §§ 703 and 704, precisely define the Act's "unlawful employment practices." Section 703 prohibits employment discrimination based on race and certain other grounds. 42 U.S.C. § 2000e-2. Section 704 prohibits discrimination against one who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Id.* § 2000e-3(a). The latter is Title VII's anti-retaliation provision. EEOC's complaint does not allege any violation of either of those "unlawful employment practices."

And for good reason: The caselaw is clear that the mere use of terms in a severance agreement does not, alone, run afoul of either prohibition. Because there is no allegation that CVS offered better severance terms based on race, sex, religion, or other protected traits, there is obviously no claim of discrimination under § 703. *See Isbell*, 418 F.3d at 795. And courts have uniformly held that even *undisputed* charge-filing bans do not constitute actionable retaliation on their face. Retaliation occurs if the employee "engaged in activity protected by Title VII" and the employer as a result "took an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012). If an employer merely offered a contract and an employee accepted it, there was *no* protected activity and *no* adverse action.[2]

[2] Some courts have allowed retaliation claims if an employer takes adverse action based on "anticipation" that the employee would engage in protected activity. *See Sauers v. Salt Lake Cnty.*, 1 F.3d 1122, 1128 (10th Cir. 1993). But no court has allowed a retaliation claim despite there being *neither* protected activity *nor* adverse action.

As the Sixth Circuit thus explained in the leading case, an employer who "offer[s] a contract" and "engage[s] in no further action" has not retaliated; "mere offer" of the agreement does not, "without more, amoun[t] to facial retaliation," even if it expressly "condition[s] severance pay on promises … not to file charges with the EEOC." *SunDance*, 466 F.3d at 497-98, 500-01. While the Sixth Circuit agreed that an outright ban on EEOC charge-filing "may be unenforceable" as contrary to public policy, it nonetheless held that "its inclusion in [contract] does not make … offering that [contract] in and of itself *retaliatory*." *Id.* at 501; *see also EEOC v. Morgan Stanley & Co.*, No. 01-Civ-8421, 2002 U.S. Dist. LEXIS 17484, at *4-5 (S.D.N.Y. Sept. 20, 2002) (finding non-assistance provision contrary to public policy).

Courts have uniformly followed *SunDance*. *See Romero v. Allstate Ins. Co.*, 3 F. Supp. 3d 313, 335 (E.D. Pa. 2014) (invalidating release but refusing "to turn these infirmities into a substantive violation of the anti-retaliation statutes"), *aff'd*, *Allstate Ins.*, 778 F.3d at 452 (following *Sundance*); *DeCecco v. UPMC*, 3 F. Supp. 3d 337, 396 (W.D. Pa. 2014) ("[A]lthough provisions of the Separation Agreement may be unenforceable, their existence … does not support a claim of retaliation."); *EEOC v. Nucletron Corp.*, 563 F. Supp. 2d 592, 598 (D. Md. 2008) ("[O]ffer of the severance agreement is insufficient to constitute … retaliation."); *EEOC v. Sears, Roebuck & Co.*, 857 F. Supp. 1233, 1239 (N.D. Ill. 1994) ("[C]onditioning severance benefits on an invalid release is not actionable."); *EEOC v. Cognis Corp.*, No. 10-cv-2182, 2012 U.S. Dist. LEXIS 71870, at *20-21 (C.D. Ill. May 23, 2012). Here, EEOC does not challenge these precedents, or allege that the Agreement violates § 704.

**2.** Because EEOC cannot allege any substantive Title VII violation, it instead argues that CVS's use of the Agreement constitutes a "pattern or practice" of resisting the "rights secured by" Title VII. That is *backwards*: Pattern-or-practice claims target *repeat* discriminators and give EEOC a vehicle to seek class-wide relief. A pattern-or-practice cannot be established absent substantive violations of the law, *i.e.*, unlawful discrimination (whether ordinary discrimination under § 703, or § 704 "discrimination," colloquially known as retaliation). EEOC's contrary view is badly misguided and contradicts every imaginable source of authority.

As explained, §§ 703 and 704 of the Civil Rights Act define a forbidden set of "unlawful employment practices." Section 705 then creates EEOC. 42 U.S.C. § 2000e-4. Section 706 sets forth the Act's usual "enforcement provisions." *See id.* § 2000e-5. Finally, § 707 authorizes suits alleging that an employer "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described." *Id.* § 2000e-6(a). In light of their importance, such cases are entitled, upon request, to expedition and a three-judge court. *Id.* § 2000e-6(b). Congress in 1972 transferred the power to bring these suits from the Attorney General to EEOC, granting EEOC "authority to investigate and act on a charge of a pattern or practice of discrimination." *Id.* § 2000e-6(c), (e).

Section 707 has always been understood—by courts, Congress, even EEOC—as authorizing class action-like suits against *policies of discrimination* in violation of §§ 703 or 704. In the statutory parlance, "the rights secured by this subchapter"

and "the rights herein described" refer to the rights, "secured" and "described" by §§ 703 and 704, to be free of *discrimination*. No discrimination necessarily means no pattern-or-practice of resisting those rights.

*The Courts*. The leading case, *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977), explained that a pattern-or-practice suit under § 707(a) is akin to a class action. *Id.* at 360. "In a suit brought by the Government under § 707(a) of the Act the District Court's initial concern is in deciding whether the Government has proved that the defendant has engaged in a pattern or practice of discriminatory conduct." *Id.* at 343 n.24. The Court held that because the Government there alleged "a systemwide pattern or practice of resistance to the full enjoyment of Title VII rights," it "had to establish" that "*discrimination* was the company's standard operating procedure—the regular rather than the unusual practice." *Id.* at 336 (emphasis added). Congress intended § 707 to apply if an employer "repeatedly and regularly" engaged in employment practices "prohibited by the statute." *Id.* at 336 n.16 (quoting legislative history). That is, the *premise* of a pattern-or-practice claim is that the employer is a repeat violator of one or both of the Act's substantive prohibitions (§§ 703 and 704). Section 707 does not prohibit *distinct* misconduct; it creates an enforcement tool against *repeat* misconduct.

Since *Teamsters*, the Supreme Court has, without deviation, described § 707 as a tool against systemic *discrimination*. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 n.4 (2006) (citing § 707, "Title VII … authoriz[es] suits by the Government to enjoin 'pattern or practice' *discrimination*."); *EEOC v. Waffle House, Inc.*, 534 U.S.

279, 286 (2002) ("[Title VII] authorized … actions by the Attorney General in cases involving a 'pattern or practice' of *discrimination*."); *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 454 n.29 (1986) ("[T]he Attorney General [had] the power to institute suit in cases where there existed a pattern or practice of *discrimination*."); *EEOC v. Shell Oil Co.*, 466 U.S. 54, 56 (1984) ("Section 707(e) … authorizes the [EEOC] 'to investigate and act on a charge' that an employer has engaged in 'a pattern or practice' of employment *discrimination*."); *Gen. Tel. Co. of Nw. v. EEOC*, 446 U.S. 318, 327 (1980) ("Prior to 1972, the only civil actions authorized" involved a suspected "'pattern or practice' of *discrimination*.") (all emphases added). No decision suggests any broader meaning.

This Court, too, has long observed that "[t]he purpose of Section 707(a)" is to allow suit "where a 'pattern or practice'" of "discrimination" exists. *United States v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 438 F.2d 679, 681 (7th Cir. 1971). Pattern-or-practice is "a method of proving discrimination" "prohibited by section 703," requiring a "showing that an employer regularly and purposefully discriminates." *Council 31, AFSCME, AFL-CIO v. Ward*, 978 F.2d 373, 378 (7th Cir. 1992). It is a "clai[m] of classwide discrimination," *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 866 n.6 (7th Cir. 1985), on a "theory of intentional discrimination," *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716-17 (7th Cir. 2012); *see also EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 308 (7th Cir. 1988) ("unlawful pattern or practice of discrimination"). Other Circuits all agree that claims "under § 707 … are limited to allegations of a pattern or practice of discrimination." *Serrano v. Cintas Corp.*, 699

F.3d 884, 894 (6th Cir. 2012). That is, "in Title VII jurisprudence 'pattern-or-practice' simply refers to a method of proof and does not constitute a 'freestanding cause of action.'" *Parisi v. Goldman, Sachs & Co.*, 710 F.3d 483, 487 (2d Cir. 2013)); *see also Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355 (5th Cir. 2001) ("A pattern or practice case is not a separate and free-standing cause of action ..., but is really 'merely another method by which disparate treatment can be shown.'").

In sum, as one court recently put it, "whether a suit is filed pursuant to § 706 or § 707, it seeks to enforce rights guaranteed by § 703. ... [T]here is technically no such thing as a 'pattern or practice violation' or a § 707 violation; there are just patterns or practices of violating § 703." *EEOC v. Bass Pro Outdoor World, LLC*, 35 F. Supp. 3d 836, 853 n.10 (S.D. Tex. 2014). No court has ever held otherwise.

*Congress*. The Supreme Court has repeatedly looked to Title VII's legislative history to construe § 707. *Teamsters*, 431 U.S. at 336 n.16; *Gen Tel.*, 446 U.S. at 327-29. That history is fully consistent with the above-described judicial consensus and confirms that Congress contemplated pattern-or-practice suits as equivalent to class actions that challenge widespread *discrimination*.

Section 707 was incorporated into the original Act because Senators insisted authorities needed some way to take action "where [they] feel that there is a pattern of *discrimination*." 110 Cong. Rec. 14,189 (1964) (Sen. Pastore) (emphasis added). Under § 707, the Attorney General may "institute suit whenever he has reasonable cause to believe that there is a pattern or practice of *discrimination*." *Id.* at 12,722 (Sen. Humphrey); *see also id.* at 12,596 (Sen. Clark) (Attorney General must "find in

each instance a pattern of *discrimination*"); *id.* at 14,191 (Sen. Javits) ("Attorney General can bring a suit to establish a pattern or practice of *discrimination*.") (all emphases added). As one Member of Congress explained, "[t]he words 'resistance to enjoyment of the rights' under the act means no more than refusal to comply with titles II or VII of the act: that is, engaging in any prohibited discrimination." *Id.* at 15,895 (Rep. Celler).

Moreover, when Congress in 1972 transferred pattern-or-practice authority to EEOC, it reiterated this understanding. A House Committee described § 707 as authorizing "*discrimination* suits" that attack "deeply imbedded … *discrimination*," H.R. Rep. 92-238, at 13-14 (1971) (emphases added); a Senate Committee likewise recounted how § 707 allows "broad-scale actions against any 'pattern or practice' of *discrimination*," S. Rep. 92-415, at 28 (1971) (emphasis added). One prominent senator described a pattern-or-practice as "nothing but a broader version involving more parties in greater depth in terms of length of time and the prevalence of a given practice than an individual suit." 118 Cong. Rec. 4081 (1972) (Sen. Javits). The legislative history reveals no disagreement on this point.

*Executive Branch*. Even EEOC and the U.S. Justice Department have long advanced the same view. In *Teamsters*, the Government contended that, in a pattern-or-practice case, the question is "whether a company has regularly engaged in *discriminatory* acts." Br. for U.S. and EEOC at *26 & n.30, *Teamsters*, 431 U.S. 324, 1976 WL 181355 (emphasis added). In later cases, it similarly took the view that § 707 requires a pattern of *discrimination*. *See* Br. for EEOC at *33, *Shell Oil*,

1983 U.S. S. Ct. Briefs LEXIS 66 (describing § 707 as authorizing "civil 'pattern or practice' actions only where" there is "'a 'pattern or practice' of discrimination in violation of Title VII"); Br. for EEOC at *27, *Gen. Tel.*, 446 U.S. 318, 1980 WL 339554 ("Attorney General … was empowered under Section 707 … to bring suit if he was satisfied that a 'pattern or practice' of discrimination existed."). And EEOC continues to tell the courts that "'pattern or practice' is an evidentiary framework, not a 'claim.'" Br. of EEOC at 40, *EEOC v. Geo Grp.*, No. 13-16292 (9th Cir. 2014), http://www1.eeoc.gov/eeoc/litigation/briefs/geogroup.html. For its part, the Justice Department publicly articulates the same understanding: Under "[s]ection 707 of Title VII, the Attorney General has authority to bring suit [in public-sector cases] … where there is reason to believe that a 'pattern or practice' of discrimination exists." *Employment Section Overview*, http://www.justice.gov/crt/about/emp/overview.php.

3. In the face of this overwhelming authority confirming that § 707 is directed toward repeated or systemic acts of *discrimination* (which EEOC does not allege here), EEOC quotes Title VII's text, cites a handful of cases, and raises policy considerations. None of its arguments has merit.

*Text*. EEOC argues that § 707 must extend beyond *discriminatory* patterns or practices because Congress chose to refer to a "pattern or practice of *resistance*" to "the rights secured" and "described" by Title VII, not just a pattern or practice of "unlawful employment practices." (EEOC.Br.26-27.) Actually, Congress used the two phrases interchangeably. 42 U.S.C. § 2000e-6(e) (giving EEOC "authority to investigate and act on a charge of a pattern or practice of discrimination"). And the

"rights secured by" Title VII are the *substantive* rights to be free of discrimination, set forth in §§ 703 and 704—not the *procedures* one follows to *vindicate* those rights (like filing an EEOC charge, the "right" EEOC claims was "resist[ed]" here). Of course, Title VII also protects invocation of its procedural machinery—but, as the District Court noted, does so through § 704, its anti-retaliation provision. App.4 n.2. Section 707 is not some type of super-anti-retaliation rule that goes *beyond* the Act's express retaliation provision.

Moreover, even if "the rights secured" and "described" by Title VII included these *procedures*, paying someone not to exercise a right is not, in ordinary parlance, "resistance" thereto. After all, settling a Title VII claim means paying the employee not to sue; nobody calls that resisting Title VII. *Cf. Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 624 (7th Cir. 2002) ("[T]he impropriety of such a 'bribe' is unclear to us, since another way to describe it is as an offer to settle a dispute out of court."). Even EEOC agrees that settlements must "offer some sort of consideration … in exchange for the employee's waiver of the right to sue." EEOC, *Understanding Waivers of Discrimination Claims In Employee Severance Agreements*, § III, http://www.eeoc.gov/policy/docs/qanda_severance-agreements.html. To be sure, courts may refuse to enforce a voluntary waiver of the procedural right to work with EEOC—but that hardly means *offering* the waiver is "resistance" to that right.

As for why the 1964 Congress chose this formulation, EEOC itself explains: It was drawn from (and incorporated into) other civil rights laws. (EEOC.Br.27-29.) Rather than a pattern of "unlawful employment practices" in one statute, a pattern

of "unlawful housing practices" in another, etc., Congress conceptualized a "pattern or practice of resistance" to "rights secured by" the particular law, and then used that concept in various contexts. The critical point—which EEOC ignores—is that *no* court has endorsed EEOC's nebulous definition of pattern-or-practice in *any* of these laws. *E.g.*, *United States v. Lansdowne Swim Club*, 894 F.2d 83, 88 (3d Cir. 1990) (requiring, in Title II case, showing of "pattern or practice of discrimination"); *see also Hr'gs Before H. Comm. on Judiciary on H.R. 10327*, 86th Cong., 2d Sess. 13 (in hearings on 1960 Civil Rights Act, describing pattern-or-practice as when "court finds that the discrimination was not an isolated or accidental or peculiar event").

*Caselaw.* EEOC cites three district court cases from the 1960s as the primary basis for its construction of § 707. Invocation of these cases is mystifying, as each involved blatant race discrimination. *United States v. Gulf-State Theaters, Inc.*, involved "a policy of refusing to admit Negroes to [movie] theaters because of their race." 256 F. Supp. 549, 551 (N.D. Miss. 1966) (per curiam). In *United States v. Sampson*, officials allegedly conspired in "assaults on Negro patrons … to deprive [them] of their rights [under Title II of the Act] to equal enjoyment of places of public accommodations." 256 F. Supp. 470, 473-74 (N.D. Miss. 1966) (per curiam). And in *United States v. Original Knights of the Ku Klux Klan*, the notorious Klan "beat and threatened Negro pickets to prevent them from enjoying the right of equal employment opportunity." 250 F. Supp. 330, 356 (E.D. La. 1965). All three cases involved egregious discrimination, and EEOC's bizarre attempt to analogize CVS's allegedly "confusing" severance agreement to such racial violence is offensive.

At most, these cases stand for an entirely different proposition—that some non-employers may be held liable under § 707, if they contribute to an unlawful discrimination policy. (EEOC.Br.23, 31-33.) *See Gulf-State*, 256 F. Supp. at 557 (enjoining a shareholder because "racial policy of the theaters flows largely from [him]"); *Original Knights*, 250 F. Supp. at 356 (enjoining defendants because they "intimidate[d] employers" into discriminating); *see also United States v. Bd. of Educ. for Sch. Dist. of Phila.*, 911 F.2d 882, 892 (3d Cir. 1990) (recognizing § 707 claim against Pennsylvania based on allegedly "discriminatory" state law that affected teachers, even though the state was "not … the employer"). But that is irrelevant here. CVS *is* an employer; the issue is whether there has been any pattern-or-practice violation. EEOC's cases do not begin to establish *that*.

*Policy.* EEOC contends that if employees are misled about their rights to communicate with the agency, then its work will be impaired. (EEOC.Br.39.) The implication is that this Court should construe § 707 expansively to solve that policy problem. But there are ample tools that the agency may use to address this concern. Giving EEOC unbounded authority to enjoin any otherwise-lawful practices to which it objects would thus be an unnecessary—and dangerous—innovation.

For one thing, courts have held that a contract provision that purports to ban EEOC charge-filing or cooperation is unenforceable. *Cosmair*, 821 F.2d at 1090; *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 456 (6th Cir. 1999) (noting that "individual may not contract away her right to file a charge with the EEOC"). EEOC cites these cases (EEOC.Br.39-41), but none approves the broad proposition

it advances here—that such a contract *violates Title VII*. There is a significant difference between refusing to enforce a contract versus holding an employer liable for offering it. *See supra* Part I.B.1. And the power to obtain the former relief (*e.g.*, in a declaratory judgment action) undermines EEOC's professed need for the latter. App.4 n.3 ("And, even if the [Agreement] explicitly banned filing charges, those provisions would be unenforceable and could not constitute resistance ....").

Moreover, § 706(f)(2) of Title VII authorizes the EEOC to seek "temporary or preliminary relief" during an investigation, "to carry out the purposes of this Act." 42 U.S.C. § 2000e-5(f)(2). Some courts allow EEOC to utilize that power to enjoin anti-cooperation provisions that irreparably harm particular EEOC investigations. *See Astra*, 94 F.3d at 745-46 (affirming injunction against cooperation ban causing irreparable harm, but vacating injunction against charge-filing ban, since it was not affecting any investigation); *cf. Severn Trent*, 358 F.3d at 445 (refusing injunction). Had CVS's Agreement impeded any EEOC investigation, EEOC could have sued under this provision anytime after CVS produced Ramos's agreement in 2012. (It did not.) This remedy further undermines the need to interpret § 707 expansively.[3]

Conversely, the policy consequences of adopting EEOC's unprecedented construction of § 707 are troubling. If a pattern-or-practice suit may be pursued even absent discrimination, so long as EEOC alleges that the employer's acts may "interfere" with EEOC's processes, then § 707 hands EEOC a stunningly unbounded

---

[3] In addition, if a former employee was misled by an overbroad severance agreement and as a result did not file a timely EEOC charge, that may perhaps, in some circumstances, warrant equitable tolling of Title VII's charge-filing period. *See Beckel*, 301 F.3d at 624.

authority to challenge any employer policy it believes to be "bad"—an authority that EEOC, implausibly, first discovered 50 years after the section's enactment.

On that logic, EEOC could allege, *e.g.*, that *any* release of Title VII claims can be enjoined, because employees are less likely to file charges if they will not obtain personal relief. *But see Isbell*, 418 F.3d at 792-93 (upholding release). EEOC could challenge mandatory arbitration clauses for Title VII claims, because they too could dissuade employees from approaching EEOC. *But see 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009) (upholding such clause). Or EEOC could argue that employers must *affirmatively advise* employees of their right to file an EEOC charge. *But see Ribble*, 2012 U.S. Dist. LEXIS 21822, at *24 (upholding release even though it did not "explicitly state[] that a signing employee retains the right to file a charge"). Or EEOC could try to block employers' pursuit of civil discovery, because that may deter other employees from suing. *See* Erica Teichert, *EEOC Says Social Media Discovery Scares Plaintiffs Away*, LAW360 (Mar. 12, 2014) (reporting concern by senior EEOC attorney that discovery into Title VII plaintiffs' social media makes employees "far less willing to participate in our cases" and thus has "chilling effect"). The possibilities for an overzealous agency are endless.

In short, transforming § 707 from a class-action device into an open-ended, independent category of undefined wrongdoing would conflict with the statute's text, structure, and legislative history, and uniform caselaw. It would also "bring about an enormous and transformative expansion in [EEOC's] regulatory authority without clear congressional authorization," *Util. Air Regulatory Grp. v. EPA*, 134 S.

Ct. 2427, 2444 (2014), vesting EEOC with a novel, far-reaching power to define new "violations" of Title VII. *Cf. id.* (greeting with "skepticism" an agency's claim "to discover in a long-extant statute an unheralded power").

### C. EEOC Cannot Plausibly Allege That CVS *Intentionally* Sought To Deny Title VII Rights by Offering a Severance Agreement That Former Employees Might *Misunderstand*.

Finally, even if this Court were to accept EEOC's construction of both the Agreement and of § 707, EEOC's claim is still not viable here. Whatever its scope, § 707 includes an *intent* element. The pattern-or-practice must be "*intended* to deny the full exercise" of Title VII rights. 42 U.S.C. § 2000e-6(a) (emphasis added); *see also Council 31*, 978 F.2d at 378 (pattern-or-practice claims require "showing that an employer … purposefully discriminates"); *Puffer*, 675 F.3d at 716 ("Pattern-or-practice claims … represent a theory of intentional discrimination.").

Here, EEOC claims that the Agreement, even if it does not forbid charge-filing or EEOC cooperation, could be *misunderstood* by employees as doing so. That is a claim about the Agreement's *effects*—not CVS's *intent*. (EEOC.Br.47 (arguing that Agreement has "chilling effect" and "deterrent effect").) It therefore does not represent a plausible claim of any *intentional* resistance to Title VII rights.

To be sure, EEOC's brief includes a wholly conclusory assertion that the Agreement would cause an employee to be "deliberately misled as to his/her Title VII rights." (EEOC.Br.42.) But that bare allegation is insufficient, given the inherent absurdity of the idea that CVS drafted a contract using "confusing" words intentionally to confuse signatories. Particularly since the Agreement (i) expressly stipulates that cooperation with EEOC is permitted; (ii) urges all signatories to

"seek the advice of legal counsel"; and (iii) gives them 21 days during which to seek such counsel plus 7 days to revoke even after signing it, any allegation that CVS deliberately sought to confuse its employees as part of some sinister plot to interfere with EEOC is hardly better than a conspiracy theory. Had CVS sought to mislead ignorant employees, it would have directly barred charge-filing, like the employers in *Astra* and *SunDance*.

In sum, these allegations are not a "story that holds together," and cannot be credited. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010); *see also Atkins v. City of Chicago*, 631 F.3d 823, 831-32 (7th Cir. 2011) (allegations cannot be "unrealistic," or "contradicted" by material attached to complaint). While EEOC apparently believes that a "reasonable fact-finder" could infer illicit intent merely from the Agreement's supposed facial ambiguity (EEOC.Br.42), that cannot, as a matter of law, be enough.[4]

[4] For the same reason, EEOC's cited cases construing the National Labor Relations Act ("NLRA") (EEOC.Br.47-48) are inapt. That statute does not require "proof of coercive intent" to establish a violation. *NLRB v. Gen. Thermodynamics, Inc.*, 670 F.2d 719, 721 (7th Cir. 1982). Accordingly, workplace rules likely to have the *effect* of deterring union organizing may unlawfully "interfere with … exercise of the rights guaranteed" by the Act. 29 U.S.C. § 158(a)(1). By contrast, Title VII includes no analogous "interference" rule, and § 707 *does* require intent. *Cf. EEOC v. Mach Mining, LLC*, 738 F.3d 171, 176 (7th Cir. 2013) (warning against importation of NLRA concepts into Title VII), *rev'd on other grounds*, 135 S. Ct. 1645 (2015). Further, the NLRA cases rest on deference to the interpretation and application of the statute by the NLRB. *See, e.g.*, *Brandeis Mach. & Supply Co. v. NLRB*, 412 F.3d 822, 829-30 (7th Cir. 2005) (applying "deferential standard"). EEOC, by contrast, does not adjudicate Title VII claims and so is not entitled to such deference. *E.g.*, *EEOC v. Chicago Club*, 86 F.3d 1423, 1428 (7th Cir. 1996).

## II. THE EEOC VIOLATED BOTH TITLE VII AND ITS OWN REGULATIONS WHEN IT SKIPPED MANDATORY PRE-SUIT PROCEDURES AND FILED THIS SUIT.

Adding insult to injury, EEOC told CVS that even if the company agreed to all of its remedial demands (many of which had no basis in law), EEOC would not resolve the case privately through a conciliation agreement. It would, instead, insist on filing a public complaint and obtaining a consent decree. That conduct violated CVS's procedural rights and caused it prejudice, which is another basis to affirm the judgment below. Congress required conciliation before *any* EEOC suit, to ensure that litigation remained a last resort. And EEOC's own regulations require the same. EEOC's position here—that § 707 cases need not be conciliated if they are not preceded by a "charge" or do not allege "discrimination"—is irreconcilable with the record; the statutory text, purpose, and history; decades of caselaw; and the agency's binding regulations.

### A. EEOC Must Attempt To Resolve *All* Claims Through Confidential Conciliation Before Bringing Suit, But It Violated That Duty Here.

Congress's intention in Title VII has always been "to promote conciliation rather than litigation." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 764 (1998). As such, EEOC has no authority to file suit until it has first complied with Title VII's multistep pre-suit administrative scheme, which includes an attempt to settle the matter through confidential conciliation—regardless of whether it proceeds under § 706 or § 707. EEOC itself has long recognized that; has so advised courts and Congress; and has memorialized that obligation in independently binding regulations.

1. When Congress enacted Title VII in 1964, "[c]ooperation and voluntary compliance" were its "preferred means" for ending discrimination. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974). "To this end, Congress created [EEOC] and established a procedure whereby" it would attempt "to settle disputes through conference, conciliation, and persuasion before the aggrieved party was permitted to file a lawsuit." *Id.* EEOC could not itself sue. *Gen. Tel.*, 446 U.S. at 325.

In 1972, Congress amended the Act "to empower the [EEOC] to bring suit … against a private employer." *Occidental Life Ins. Co. v. EEOC*, 432 U.S. 355, 357 (1977). But it must "refrain from commencing a civil action until it has discharged its administrative duties," by following an "integrated, multistep enforcement procedure." *Id.* at 359, 368. That procedure includes the filing of a charge by an aggrieved person or an EEOC Commissioner, notice of the charge to the employer, investigation of the allegations, determination by EEOC of reasonable cause, and efforts to resolve the case via "conference, conciliation, and persuasion," 42 U.S.C. § 2000e-5(b). Importantly, the employer is entitled to confidentiality in conciliation, and thus to *private* resolution. *Id.* ("Nothing said or done during and as a part of such informal endeavors may be made public …."). Only if such conciliation *fails*—if EEOC is "unable to secure" an acceptable conciliation agreement—may it sue. *Id.* § 2000e-5(f)(1). In short, litigation is EEOC's "last resort," *EEOC v. Asplundh Tree Expert Co.*, 340 F.3d 1256, 1261 (11th Cir. 2003); Congress intended it to sue "[o]nly if conciliation proves to be impossible," *EEOC v. Zia Co.*, 582 F.2d 527, 533 (10th Cir. 1978) (quoting conference report).

As the Supreme Court recently reiterated, conciliation "is a key component of the statutory scheme." *Mach Mining, LLC v. EEOC*, 135 S. Ct. 1645, 1651 (2015). And as EEOC told a Senate committee just last month, its "statutory authority does not contemplate or permit" "suing first, and asking questions later." Statement of P. David Lopez to Sen. Comm. on Health, Educ., Labor & Pensions at 6, May 19, 2015, http://www.help.senate.gov/imo/media/doc/Lopez3.pdf; *see also* Statement of Jenny R. Yang to Sen. Comm. on Health, Educ., Labor & Pensions at 2, May 19, 2015, http://www.help.senate.gov/imo/media/doc/Yang.pdf (litigation is "last resort").

**2.** Congress in 1972 also transferred to EEOC the Attorney General's authority to file pattern-or-practice suits. *Gen. Tel.*, 446 U.S. at 328. But Congress required EEOC to "carry out such functions in accordance with subsections (d) and (e) of this section." 42 U.S.C. § 2000e-6(c). Section 707(d) addressed *pending* cases, allowing EEOC to be substituted in cases initiated by the Attorney General. *Id.* § 2000e-6(d). Section 707(e) addressed *future* cases, allowing EEOC "to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission." *Id.* § 2000e-6(e). However, Congress required there that "[a]ll such actions shall be conducted in accordance with the procedures set forth in [§ 706] of this title." *Id.*

By cross-referencing § 706 as dictating the "procedures" EEOC must follow in § 707 actions, Congress made clear that EEOC must *in all cases* comply with § 706's "multistep enforcement procedure[s]," *Occidental Life*, 432 U.S. at 359—including conciliation. That is, because § 707(e) incorporates § 706 procedures, EEOC's duty

to engage in pre-suit conciliation extends equally to § 707 pattern-or-practice claims. *Accord* H.R. Rep. 92-238, at 29 (1971) (provision "[a]ssimilates procedures for new proceedings brought under [§] 707 to those now provided for under [§] 706").

Courts have consistently recognized this procedural equivalence. *EEOC v. United Air Lines*, No. 73-C-972, 1975 U.S. Dist. LEXIS 11689, at *4-5 (N.D. Ill. June 26, 1975) ("[EEOC's] new authority under 707(c) … is required to be exercised in accordance with the procedures set forth in [§] 706(b), which includes efforts to conciliate …."); *EEOC v. Whirlpool Corp.*, 80 F.R.D. 10, 17 (N.D. Ind. 1978) ("[B]oth [§] 706 and [§] 707 suits must now be preceded by investigation, a reasonable cause determination and conciliation."); *EEOC v. Bloomberg L.P.*, 751 F. Supp. 2d 628, 644 (S.D.N.Y. 2010) (§ 706 procedural requirements "are incorporated by reference into the EEOC's authority to bring 'pattern or practice' claims"); *EEOC v. Kaplan Higher Educ. Corp.*, 790 F. Supp. 2d 619, 622 (N.D. Ohio 2011) ("EEOC's ability to act under § 707, however, is subject to the procedures of § 706 …."); *see also United States v. New Jersey*, 473 F. Supp. 1199 , 1205 (D.N.J. 1979) (only EEOC, not Attorney General, is bound by § 706 procedures in § 707 cases); *United States v. City of Yonkers*, 592 F. Supp. 570, 583 (S.D.N.Y. 1984) (Attorney General, unlike EEOC, not "shackle[d]" by EEOC's "administrative machinery").

Courts thus routinely analyze, in EEOC pattern-or-practice suits under § 707, compliance with § 706's pre-suit duties. *E.g.*, *EEOC v. Bass Pro Outdoor World, LLC*, 1 F. Supp. 3d 647, 656-60 (S.D. Tex. 2014); *EEOC v. JBS USA, LLC*, 940 F. Supp. 2d 949, 965-67 (D. Neb. 2013); *Bloomberg*, 751 F. Supp. 2d at 637-40.

EEOC itself has admitted that "whether filed under 42 U.S.C. § 2000e-5 (§ 706) or § 2000e-6 (§ 707), all EEOC litigation shares the same administrative prerequisites." Br. for EEOC at 62, *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657 (8th Cir. 2012), http://www.eeoc.gov/eeoc/litigation/briefs/crst.txt. Likewise, EEOC recently advised the Ninth Circuit that "§ 706 and § 707 impose the *same* pre-suit requirements" and it would "def[y] the reality of EEOC's administrative process to hold that § 706 and § 707 impose different pre-suit requirements." Br. for EEOC at 45-46, *Geo Grp., Inc.*, No. 13-16292. Similarly, not long after the 1972 Act, the Government told the Fourth Circuit that "[s]ections 707(c), (d) and (e), when read together, indicate that in all cases in which EEOC has pattern or practice authority, EEOC must adhere to the procedural requirements of [§] 706 before filing suit." Br. for U.S. at *21, *United States v. North Carolina*, 587 F.2d 625 (4th Cir. 1978) (No. 77-1614), 1977 WL 203655. And EEOC's own recent Senate testimony drew no distinction between § 706 and § 707, stating flatly that the law "authorizes" it to sue *only* if "informal resolution was not possible." Statement of P. David Lopez, *supra*, at 2. *Cf. Young v. United Parcel Serv., Inc.*, 135 S.Ct. 1338, 1352 (2015) (rejecting EEOC view where "inconsistent with positions for which the Government has long advocated").

**3.** EEOC regulations "contain the procedures" for "administration and enforcement of title VII," 29 C.F.R. § 1601.1, and further codify EEOC's conciliation duty. They do not distinguish § 706 from § 707 cases, but provide that *whenever* EEOC has "reasonable cause to believe that an unlawful employment practice has

occurred or is occurring, [it] shall endeavor to eliminate such practice by informal methods of conference, conciliation and persuasion." 29 C.F.R. § 1601.24(a). And anything said in conciliation is confidential. *Id.* § 1601.26(a). If EEOC concludes that it cannot obtain voluntary compliance, "it shall … so notify" the employer "in writing." *Id.* § 1601.25. EEOC may "bring a civil action" if it is unable to secure "a conciliation agreement acceptable to the Commission," *id.* § 1601.27, and otherwise has no authority to sue. These regulations bind EEOC, even if Title VII does not require conciliation itself. *Shell Oil*, 466 U.S. at 67 ("Until rescinded, this rule is binding on [EEOC] …."); *Vitarelli v. Seaton*, 359 U.S. 535, 539-40 (1959).

4. Here, EEOC jettisoned its entire "multistep enforcement procedure," *Occidental Life*, 432 U.S. at 359, and refused even to *consider* resolution through conciliation. CVS was revising its Agreement to clarify the alleged ambiguities. R.17-1 at 52-53, McConnell Aff. Exh K. But EEOC insisted *no* settlement would be acceptable unless embodied in a consent decree *after* EEOC filed a public suit. *Id.* Title VII, however, guarantees CVS an opportunity to resolve the dispute *pre-suit* and *confidentially*—without the spectacle, cost, and reputational damage attendant upon EEOC's filing and trumpeting a lawsuit. Congress felt so strongly about this confidentiality that it *criminalized* any breach. 42 U.S.C. § 2000e-5(b).[5]

[5] EEOC's regulatory violations here extend beyond its conciliation failure. For example, 29 C.F.R. § 1601.21(a) authorizes EEOC to find reasonable cause only if EEOC "has not settled or dismissed a charge or made a no cause finding." Here, EEOC dismissed Ramos' charge, R.17-1 at 45, McConnell Aff. Exh. I; its reasonable-cause finding was thus unauthorized. Moreover, the regulations delegate only to *district directors* the authority to make a "determination finding reasonable cause." 29 C.F.R. § 1601.21(d). Here, EEOC's *regional attorney* made that determination. R.17-1 at 41, McConnell Aff. Exh. H.

This entire action—and considerable harm to CVS—could well have been avoided had EEOC abided by its longstanding duties, rather than insist that a suit be filed *regardless* of whether CVS complied with its requests. Its conduct here is thus directly contrary to Congress's clear instruction that litigation be a *last resort* in Title VII disputes, not an *unshakeable demand*.

### B. EEOC's Revisionist Account Misreads the Statute, Distorts the Regulations, and Conflicts with Longstanding Caselaw.

EEOC admits it did not conciliate here (EEOC.Br.8), but contends that it did not have to in this § 707 case. That theory is contrary to the statutory text, finds no support in caselaw or legislative history, and disregards EEOC's own regulations.

1. As explained, Congress in 1972 authorized EEOC "to investigate and act on a charge of a pattern or practice of discrimination"—but required that EEOC do so "in accordance with the procedures set forth in [§ 706]." 42 U.S.C. § 2000e-6(e).

Here, EEOC construes that provision, § 707(e), as applying only to a *subset* of § 707 cases. In its view, § 707(c) transferred to it *all* the Attorney General's powers, and § 707(e) added only a limited caveat—that when EEOC "act[s] on a *charge* of a pattern or practice of *discrimination*," it must follow § 706 procedures. But if EEOC acts *without* a discrimination charge —which EEOC says that it, like the Attorney General, may do—then it is unencumbered by § 706. (EEOC.Br.36.) On that view, EEOC must follow the pre-suit process only "where there has been a charge." (*Id.*) This case, EEOC continues, "did not originate with a charge" (and does not involve "discrimination"); hence, it was not obliged to conciliate. (EEOC.Br.13-14, 35.)

Actually, this case *did* originate with a "charge" of "discrimination"—one filed by Ramos. R.28, SUMF Resp., ¶ 7. EEOC ultimately pursued a different theory in court, but that theory "gr[e]w out of an EEOC investigation" into Ramos's charge. *Sitar v. Indiana DOT*, 344 F.3d 720, 726 (7th Cir. 2003).

In any event, EEOC's reading of § 707 is untenable. It is contradicted by the caselaw—no court has *ever* allowed EEOC to "skip" conciliation—and by EEOC's prior statements. *See supra* Part II.A.2. (Indeed, EEOC appears to have discovered its no-charge, no-conciliation, no-discrimination § 707 authority more than four decades after Congress authorized it to file pattern-or-practice suits.) Moreover, EEOC's reading is further refuted by § 707's text, structure, purpose, and history.

*First*, the notion that § 707(e) merely adds a limited caveat to powers already fully transferred by § 707(c) is belied by the words Congress used. The provision does *not* say: "*When* EEOC investigates and acts on a charge of discrimination, it must do so in accordance with the procedures set forth in [§ 706]." Rather, it says EEOC "shall have authority" to act on charges of discrimination, and in a second sentence directs that "[a]ll such actions" be conducted using § 706 procedures. 42 U.S.C. § 2000e-6(e). On EEOC's view, the first sentence is superfluous; EEOC claims it already had even *broader* "authority" under § 707(a) and (c). But § 707(a) grants power only to the Attorney General, not to EEOC; and § 707(c) mandates that EEOC "carry out" the transferred § 707 functions "in accordance with" § 707(e). The proper reading of § 707 *as a whole* is thus that § 707(e) comprehensively details EEOC's new authority pursuant to the general § 707(c) transfer provision.

*Second*, EEOC's construction results in a nonsensical scheme. Why would Congress require EEOC to abide by § 706's pre-suit procedures for § 707 claims originating with a *charge*, but leave it free to ignore those procedures (including notice to the employer, an investigation, and conciliation) if it simply throws out the charge and proceeds without one, as EEOC asserts it may do and did here? Such reading leaves § 707(e) to "serve no function," *Horn Farms, Inc. v. Johanns*, 397 F.3d 472, 475 (7th Cir. 2005), and eviscerates Congress's desire to deny to EEOC "unconstrained" power, *Shell Oil*, 466 U.S. at 65. Similarly, why would Congress detail the "requirements" of a valid § 707 charge if EEOC could sue without one? *Id.* at 67. And why would Congress permit EEOC to bring a § 707 suit absent a charge but then deny it the more limited authority to *investigate* in that scenario? *Id.* at 64 ("EEOC's investigative authority is tied to charges filed with the Commission."); 42 U.S.C. § 2000e-8(a) (investigative power limited to matters "relevant to the charge").

*Third*, § 707's structure and history further confirm that EEOC has no power to file pattern-or-practice suits except as set forth in § 707(e). Importantly, § 707(c), the transfer provision, took effect "two years after" the 1972 amendments. 42 U.S.C. § 2000e-6(c). But § 707(e)—EEOC's authority to act on pattern-or-practice charges using § 706 procedures—took effect *immediately*. *Id.* § 2000e-6(e). Congress noted that, during that gap, there would be two years of "concurrent jurisdiction"—both EEOC and the Attorney General would have pattern-or-practice power. S. Rep. 92-681, at 19 (1972) (providing for "transfer of the Attorney General's 'pattern or practice' jurisdiction to [EEOC] two years after enactment," while "[i]n the interim

period there would be concurrent jurisdiction"). On EEOC's reading, Congress thus gave it immediate power to act on "charges" but withheld for two years its authority to act absent one. There is no logical basis or historical evidence for that dichotomy.

In reality, § 707(e) does not speak to a mere *subset* of the powers transferred to EEOC by § 707(c). Section 707(c) transfers the Attorney General's § 707 powers *on condition* that EEOC "carry out such functions in accordance with" § 707(e), and the latter describes *how* EEOC shall carry out those powers—by acting on "charges of a pattern or practice of discrimination" subject to § 706's procedures. 42 U.S.C. § 2000e-6(c), (e). That is, Congress transferred the Attorney General's powers, but EEOC may only exercise them by following § 706's administrative prerequisites—in *all* cases. Section 707(e) therefore refers to a pattern-or-practice "charge" not to exclude the (null set of) cases where EEOC proceeds absent a charge, but because that is the only way in which EEOC may ever proceed.[6] Similarly, § 707(e) refers to pattern-or-practice "of discrimination" not to exclude the (null set of) *other* pattern-

[6] To be sure, § 707(e) authorizes EEOC to act on a charge "whether filed by" an aggrieved individual "or by a member of the Commission." 42 U.S.C. § 2000e-6(e). The latter power, to act on a *Commissioner's* charge, effectively allows EEOC to proceed on its "own initiative." *Shell Oil*, 466 U.S. at 62; *EEOC v. Harvey L. Walner & Assocs.*, 91 F.3d 963, 968 (7th Cir. 1996) (noting, in dicta, that EEOC may "institute 'pattern or practice' lawsuits on its own initiative"). EEOC need not await "a charge filed by an aggrieved individual," *Serrano*, 699 F.3d at 896; it may initiate such a charge on its own. *See EEOC v. Cont'l Oil Co.*, 548 F.2d 884, 890 (10th Cir. 1977) (noting, in dicta, that § 707 does not require filing of "individual" charge). But none of these cases allows EEOC to sue without *any* charge—or, more critically, without any conciliation. EEOC also cites *United States v. Fresno Unified School District*, but that case was filed by the Attorney General, not EEOC, and expressly declined to address § 707(e), as the parties "did not address this issue below or on appeal." 592 F.2d 1088, 1096 (9th Cir. 1979). *United States v. Allegheny-Ludlum Industries, Inc.* confirms that EEOC's § 707 "investigative and conciliatory authority" aligns with "its existing powers in § 706 cases," holding only that § 707(e) did not authorize federal-court intervention by private parties. 517 F.2d 826, 844 (5th Cir. 1975); *see also id.* at 869 (noting that § 707(e) may require EEOC to conciliate, but not resolving issue).

or-practice claims, but because that is the *only* type of § 707 claim. As explained in Part I, § 707 has always been understood to address systemic discrimination, not as forbidding distinct conduct (which is why EEOC's claim also fails on the merits).

**2.** Even if Title VII did not mandate conciliation, EEOC's regulations do. EEOC's sole response is to argue that the regulation, 29 C.F.R. § 1601.24, relates to § 706 cases only. (EEOC.Br.36-37.) That revisionist position fails for two reasons.

*First*, EEOC waived this argument below. CVS argued in its motion that the regulations independently required conciliation in all cases, and that dismissal was accordingly warranted. R.16, Mem. of Law, at 26-27. EEOC's opposition nowhere addressed (or even cited) its regulations. R.27, Opp., at 24-25. This Court "refuse[s] to consider arguments that were not presented to the district court in response to summary judgment motions." *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996); *Blue v. Hartford Life & Acc. Ins. Co.*, 698 F.3d 587, 597 (7th Cir. 2012).

*Second*, EEOC's reading—that its regulations address only § 706 claims—is not viable. The regulations establish "*the* procedures established by [EEOC] for carrying out its responsibilities in the administration and enforcement of title VII." 29 C.F.R. § 1601.1 (emphasis added). They do not say that EEOC will also exercise procedures unmentioned by its regulations. And regulatory history proves the point. After the 1972 amendments, EEOC promulgated regulations addressing exercise of its functions "regarding the processing of cases under section 707." 40 Fed. Reg. 16193, 16193 (Apr. 10, 1975). They explained how a § 707 proceeding would begin with a charge; proceed with an investigation to determine if the employer "engaged

in a pattern or practice of unlawful discrimination"; and then move to conciliation, only on failure of which would a suit be instituted. *See id.* at 16193-94 (adding 29 C.F.R. § 1601.50 through § 1601.59). EEOC later rescinded those rules, but then explained that "[i]n the future, 707 charges will be processed under the procedures set forth in Subpart B [29 C.F.R. §§ 1601.6-1601.29]." 44 Fed. Reg. 4667, 4668 (Jan. 23, 1979); *accord Shell Oil*, 466 U.S. at 68 n.19 ("[EEOC] … adopted a single regulation applicable to both kinds of charges.").

EEOC thus originally promulgated regulations for "processing of cases under section 707" that required a charge, a finding of discrimination, and conciliation; it later provided that the rules governing § 706 charges would apply equally to § 707. On neither occasion did EEOC even *hint* that § 707 suits could commence *absent* a charge, *absent* regulatory procedures, or *absent* discrimination. It strains credulity to suggest that EEOC's comprehensive procedural rules govern only a subset of its cases, and that EEOC recently discovered a whole world of other cases within its power that are not even *mentioned* in *any* regulations.

Again, EEOC's regulations, like § 707(e), address "charges" because they are the *sole* trigger for any EEOC investigation. *Shell Oil*, 466 U.S. at 62-65; 42 U.S.C. § 2000e-8(a). They refer to "unlawful employment practices," 29 C.F.R. § 1601.24(a), not to exclude the heretofore-unknown cases that challenge practices that are *not* "unlawful," but because those are the *only* practices EEOC may combat, whether under § 706 or § 707. For that reason, EEOC's unprecedented claim here, which alleges no such practices, is both substantively and procedurally barred.

## CONCLUSION

For any of these reasons, CVS respectfully requests that this Court affirm the judgment below.

Dated: June 16, 2015.

/s/ Eric S. Dreiband
Eric S. Dreiband (esdreiband@jonesday.com)
Yaakov M. Roth (yroth@jonesday.com)
Nikki L. McArthur (nmcarthur@jonesday.com)
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

*Counsel for Defendant-Appellee*
*CVS Pharmacy, Inc.*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation in Fed. R. App. P. 32(a)(7)(B). This brief contains 13,995 words and was prepared in Microsoft Word and produced with a proportional serif 12-point font.

Dated: June 16, 2015.

/s/ Eric S. Dreiband
Eric S. Dreiband
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

*Attorney for Defendant-Appellee CVS Pharmacy, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June, 2015, I caused true and correct copies of the foregoing Opening Brief of Defendant-Appellant to be served on the following via the Electronic Case Filing (ECF) service:

Elizabeth E. Theran
Equal Employment Opportunity Commission
Office of General Counsel
131 M Street, N.E., Fifth Floor
Washington, D.C. 20507
elizabeth.theran@eeoc.gov

*Counsel for Plaintiff-Appellant*
*Equal Employment Opportunity Commission*

Dated: June 16, 2015.

/s/ Eric S. Dreiband
Eric S. Dreiband
JONES DAY
51 Louisiana Avenue NW
Washington, D.C. 20001
(202) 879-3939

*Attorney for Defendant-Appellee*
*CVS Pharmacy, Inc.*

# STATUTORY AND REGULATORY APPENDIX

No. 14-3653

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellant,*

v.

CVS, INC.,

*Defendant-Appellee.*

**DEFENDANT-APPELLEE'S STATUTORY AND REGULATORY APPENDIX TABLE OF CONTENTS**

Reproduction of Relevant Authorities:

42 U.S.C. § 2000e-2(a) (§ 703(a) of the Civil Rights Act of 1964)....................1A

42 U.S.C. § 2000e-3(a) (§ 704(a) of the Civil Rights Act of 1964)....................2A

42 U.S.C. § 2000e-5 (§ 706 of the Civil Rights Act of 1964) ............................3A

42 U.S.C. § 2000e-6 (§ 707 of the Civil Rights Act of 1964) ............................9A

29 C.F.R. § 1601.1 ..........................................................................................11A

29 C.F.R. § 1601.24 ........................................................................................12A

**42 U.S.C. § 2000e-2(a). Unlawful employment practices**

**(a)** Employer practices. It shall be an unlawful employment practice for an employer--

**(1)** to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

**(2)** to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

**42 U.S.C. § 2000e-3(a). Other unlawful employment practices**

**(a)** Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title.

**42 U.S.C. § 2000e-5. Enforcement provisions**

(a) Power of Commission to prevent unlawful employment practices. The Commission is empowered, as hereinafter provided, to prevent any person from engaging in any unlawful employment practice as set forth in section 703 or 704 of this title.

(b) Charges by persons aggrieved or member of Commission of unlawful employment practices by employers, etc.; filing; allegations; notice to respondent; contents of notice; investigation by Commission; contents of charges; prohibition on disclosure of charges; determination of reasonable cause; conference, conciliation, and persuasion for elimination of unlawful practices; prohibition on disclosure of informal endeavors to end unlawful practices; use of evidence in subsequent proceedings; penalties for disclosure of information; time for determination of reasonable cause. Whenever a charge is filed by or on behalf of a person claiming to be aggrieved, or by a member of the Commission, alleging that an employer, employment agency, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, has engaged in an unlawful employment practice, the Commission shall serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on such employer, employment agency, labor organization, or joint labor-management committee (hereinafter referred to as the "respondent") within ten days, and shall make an investigation thereof. Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires. Charges shall not be made public by the Commission. If the Commission determines after such investigation that there is not reasonable cause to believe that the charge is true, it shall dismiss the charge and promptly notify the person claiming to be aggrieved and the respondent of its action. In determining whether reasonable cause exists, the Commission shall accord substantial weight to final findings and orders made by State or local authorities in proceedings commenced under State or local law pursuant to the requirements of subsections (c) and (d). If the Commission determines after such investigation that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. Nothing said or done during and as a part of such informal endeavors may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $ 1,000 or imprisoned for not more than one year, or both. The Commission shall make its determination on reasonable cause as promptly as possible and, so far as practicable, not later than one hundred and twenty days from the filing of the charge or, where applicable under subsection (c)

or (d), from the date upon which the Commission is authorized to take action with respect to the charge.

(c) State or local enforcement proceedings; notification of State or local authority; time for filing charges with Commission; commencement of proceedings. In the case of an alleged unlawful employment practice occurring in a State, or political subdivision of a State, which has a State or local law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, no charge may be filed under subsection (a) [(b)] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law, unless such proceedings have been earlier terminated, provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective date of such State or local law. If any requirement for the commencement of such proceedings is imposed by a State or local authority other than a requirement of the filing of a written and signed statement of the facts upon which the proceeding is based, the proceeding shall be deemed to have been commenced for the purposes of this subsection at the time such statement is sent by registered mail to the appropriate State or local authority.

(d) State or local enforcement proceedings; notification of State or local authority; time for action on charges by Commission. In the case of any charge filed by a member of the Commission alleging an unlawful employment practice occurring in a State or political subdivision of a State which has a State or local law prohibiting the practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, the Commission shall, before taking any action with respect to such charge, notify the appropriate State or local officials and, upon request, afford them a reasonable time, but not less than sixty days (provided that such sixty-day period shall be extended to one hundred and twenty days during the first year after the effective day of such State or local law), unless a shorter period is requested, to act under such State or local law to remedy the practice alleged.

(e) Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency.

(1) A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to

grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

(2) For purposes of this section, an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this title (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.

(3) (A) For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.

(B) In addition to any relief authorized by section 1977A of the Revised Statutes (42 U.S.C. 1981a), liability may accrue and an aggrieved person may obtain relief as provided in subsection (g)(1), including recovery of back pay for up to two years preceding the filing of the charge, where the unlawful employment practices that have occurred during the charge filing period are similar or related to unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master.

(1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d), the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the

Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d), whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsections (c) or (d) of this section or further efforts of the Commission to obtain voluntary compliance.

(2) Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation, that prompt judicial action is necessary to carry out the purposes of this Act [title], the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. It shall be the duty of a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to be in every way expedited.

(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of

actions brought under this title. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28 of the United States Code, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

**(4)** It shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

**(5)** It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure.

**(g)** Injunctions; affirmative action; equitable relief; accrual of back pay; reduction of back pay; limitations on judicial orders.

**(1)** If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer, employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable.

**(2)** **(A)** No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or

expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of section 704(a).

**(B)** On a claim in which an individual proves a violation under section 703(m) and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court--

**(i)** may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 703(m); and

**(ii)** shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment, described in subparagraph (A).

**(h)** Provisions of 29 USCS §§ 101 et seq. not applicable to civil actions for prevention of unlawful practices. The provisions of the Act entitled "An Act to amend the Judicial Code and to define and limit the jurisdiction of courts sitting in equity, and for other purposes," approved March 23, 1932 (29 U. S. C. 101-115), shall not apply with respect to civil actions brought under this section.

**(i)** Proceedings by Commission to compel compliance with judicial orders. In any case in which an employer, employment agency, or labor organization fails to comply with an order of a court issued in a civil action brought under this section, the Commission may commence proceedings to compel compliance with such order.

**(j)** Appeals. Any civil action brought under this section and any proceedings brought under subsection (i) shall be subject to appeal as provided in sections 1291 and 1292, title 28, United States Code.

**(k)** Attorney's fee, liability of Commission and United States for costs. In any action or proceeding under this title the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

**42 U.S.C. § 2000e-6. Civil actions by the Attorney General**

(a) Complaint. Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this title, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.

(b) Jurisdiction; hearing and determination. The district courts of the United States shall have and shall exercise jurisdiction of proceedings instituted pursuant to this section, and in any such proceeding the Attorney General may file with the clerk of such court a request that a court of three judges be convened to hear and determine the case. Such request by the Attorney General shall be accompanied by a certificate that, in his opinion, the case is of general public importance. A copy of the certificate and request for a three-judge court shall be immediately furnished by such clerk to the chief judge of the circuit (or in his absence, the presiding circuit judge of the circuit) in which the case is pending. Upon receipt of such request it shall be the duty of the chief judge of the circuit or the presiding circuit judge, as the case may be, to designate immediately three judges in such circuit, of whom at least one shall be a circuit judge and another of whom shall be a district judge of the court in which the proceeding was instituted, to hear and determine such case, and it shall be the duty of the judges so designated to assign the case for hearing at the earliest practicable date, to participate in the hearing and determination thereof, and to cause the case to be in every way expedited. An appeal from the final judgment of such court will lie to the Supreme Court.

In the event the Attorney General fails to file such a request in any such proceeding, it shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

It shall be the duty of the judge designated pursuant to this section to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited.

(c) Transfer of functions, etc., to Commission; effective date; prerequisite to transfer; execution of functions by Commission. Effective two years after the date of enactment of the Equal Employment Opportunity Act of 1972 [enacted March 24, 1972], the functions of the Attorney General under this section shall be transferred to the Commission, together with such personnel, property, records, and unexpended balances of appropriations, allocations, and other funds employed, used, held, available, or to be made available in connection with such functions unless the President submits, and neither House of Congress vetoes, a reorganization plan pursuant to chapter 9 of title 5, United States Code, inconsistent with the provisions of this subsection. The Commission shall carry out such functions in accordance with subsections (d) and (e) of this section.

(d) Transfer of functions, etc., not to affect suits commenced pursuant to this section prior to date of transfer. Upon the transfer of functions provided for in subsection (c) of this section, in all suits commenced pursuant to this section prior to the date of such transfer, proceedings shall continue without abatement, all court orders and decrees shall remain in effect, and the Commission shall be substituted as a party for the United States of America, the Attorney General, or the Acting Attorney General, as appropriate.

(e) Investigation and action by Commission pursuant to filing of charge of discrimination; procedure. Subsequent to the date of enactment of the Equal Employment Opportunity Act of 1972 [enacted March 24, 1972], the Commission shall have authority to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission. All such actions shall be conducted in accordance with the procedures set forth in section 706 of this Act.

**29 C.F.R. § 1601.1. Purpose**

The regulations set forth in this part contain the procedures established by the Equal Employment Opportunity Commission for carrying out its responsibilities in the administration and enforcement of title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990, and the Genetic Information Nondiscrimination Act of 2008. Section 107 of the Americans with Disabilities Act and section 207 of the Genetic Information Nondiscrimination Act incorporate the powers, remedies and procedures set forth in sections 705, 706, 707, 709 and 710 of the Civil Rights Act of 1964. Based on its experience in the enforcement of title VII, the Americans with Disabilities Act, and the Genetic Information Nondiscrimination Act, and upon its evaluation of suggestions and petitions for amendments submitted by interested persons, the Commission may from time to time amend and revise these procedures.

**29 C.F.R. § 1601.24 Conciliation: Procedure and authority.**

(a) Where the Commission determines that there is reasonable cause to believe that an unlawful employment practice has occurred or is occurring, the Commission shall endeavor to eliminate such practice by informal methods of conference, conciliation and persuasion. In conciliating a case in which a determination of reasonable cause has been made, the Commission shall attempt to achieve a just resolution of all violations found and to obtain agreement that the respondent will eliminate the unlawful employment practice and provide appropriate affirmative relief. Where such conciliation attempts are successful, the terms of the conciliation agreement shall be reduced to writing and shall be signed by the Commission's designated representative and the parties. A copy of the signed agreement shall be sent to the respondent and the person claiming to be aggrieved. Where a charge has been filed on behalf of a person claiming to be aggrieved, the conciliation agreement may be signed by the person filing the charge or by the person on whose behalf the charge was filed.

(b) District Directors; the Director of the Office of Field Programs or the Director of Field Management Programs; or their designees are hereby delegated authority to enter into informal conciliation efforts. District Directors or upon delegation, Field Directors, Area Directors, or Local Directors; the Director of the Office of Field Programs; or the Director of Field Management Programs are hereby delegated the authority to negotiate and sign conciliation agreements. When a suit brought by the Commission is in litigation, the General Counsel is hereby delegated the authority to negotiate and sign conciliation agreements where, pursuant to section 706(f)(1) of title VII, a court has stayed processings in the case pending further efforts of the Commission to obtain voluntary compliance.

(c) Proof of compliance with title VII, the ADA, or GINA in accordance with the terms of the agreement shall be obtained by the Commission before the case is closed. In those instances in which a person claiming to be aggrieved or a member of the class claimed to be aggrieved by the practices alleged in the charge is not a party to such an agreement, the agreement shall not extinguish or in any way prejudice the rights of such person to proceed in court under section 706(f)(1) of title VII, the ADA, or GINA.